UNITED STATES of America,
Appellee,

v.

Joseph MATTIA, Gerard A. Perna, John
Raio, Frank Mancinelli and Dominick
J. Natale, Appellants.

Nos. 15810–15813 and 15845.

United States Court of Appeals
Third Circuit.

Argued May 1, 1967.

Decided June 29, 1967.

Irving I. Vogelman, Jersey City, N. J., for appellants Mattia, Perna, Raio and Mancinelli, (Raymond A. Brown, Jersey City, N. J., on the brief).

John E. Toolan, Perth Amboy, N. J., for appellant Natale, (Toolan, Haney & Romond, Perth Amboy, N. J., on the brief).

B. Dennis O'Connor, Asst. U. S. Atty., Newark, N. J., (David M. Satz, Jr., U. S. Atty., Newark, N. J., on the brief), for appellee.

Before McLAUGHLIN, HASTIE and SEITZ, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

The five appellants ("defendants") appeal their conviction by a jury of participation in a conspiracy to transport counterfeit securities in interstate commerce. Several other individuals pleaded guilty.

These defendants were convicted on the count in the indictment which alleged that they and others conspired [1] to commit violations of 18 U.S.C. §§ 2314 and 2315 by possessing, receiving and transporting in interstate commerce counterfeit General Motors Acceptance Corporation bonds. They were alleged to have engaged in the overt acts of photographing, printing and counterfeiting 3,000 twenty-one year 5% 1980 GMAC bonds.

1. 18 U.S.C. § 371.

each in the amount of $1,000. Such acts allegedly took place between August 1, 1961 and December 20, 1961 at the Mattia Printing Company ("Company") plant in Newark, New Jersey. It was also charged that defendants acted as "representatives" and "employees" of the Company.

The Government established at the trial that Leo Segal [2] was one of certain individuals who retained a Florida attorney during the first week of January, 1962 to negotiate a $250,000 loan with a Florida bank to be secured by $300,000 worth of GMAC bonds. After submitting the serial numbers and the bonds at the Bank's request, Segal later advised the attorney he had found another source for the loan and withdrew the bonds. Shortly thereafter two of the non-appealing defendants were arrested in New Jersey with some of the counterfeit bonds in their possession. After further investigation indictments were obtained and thereafter these defendants were brought to trial and convicted.

Since the principal contention of these defendants is that the Government produced insufficient evidence to sustain these convictions it is necessary to delineate at length pertinent portions of the protracted testimony. This is particularly important in conspiracy cases. The "facts" must of course be evaluated in the light of the jury's guilty verdict.

The Company operated an established general printing business in Newark, New Jersey. Romeo Mattia was the owner. He was tried and acquitted. His son Joseph was manager. He was convicted and is one of the defendants here. The Company employed about thirteen persons full time including three of these defendants: viz., Raio, who was a printing press operator; Mancinelli, who was an offset pressman; and Perna, who was print shop foreman. The fifth defendant here is Natale, who was not a regular employee of the Company. He had full time employment as foreman of the negative plate department of another printing establishment. On a sporadic basis when the Company needed extra help or was busy he would work for it in the evenings after regular working hours and on weekends. On these occasions Natale mainly did photographic work, which is a step in the photo offset process. At such times he was paid the going overtime rate of pay, about $5.00 per hour. His income from the Company for all of 1961 was $300.

The fact that the bonds here involved were counterfeit was fully established. One of the crucial issues at the trial was whether the counterfeit bonds were made at the Company's plant. The record discloses that the Government's evidence strongly justified a jury finding that the counterfeit bonds were printed at the Company's plant. The Company's bookkeeper (Adler) so testified in the Government's case. Also, by way of example only, a questioned documents examiner for the F.B.I. testified that the serial numbers of a sampling of the seized bonds were printed by identified numbering machines which were delivered to a Company representative on December 12, 1961. One of the identified machines was seized by the F.B.I. at the Company's plant incidental to the arrest of the Mattias. Moreover, a thumbprint of one of these defendants Mancinelli, was found on one of the seized bonds. It was also shown that the particular bond could not have been handled by him in connection with the investigation.

We next consider whether the Government properly "linked" these defendants with the printing of the bonds. The key Government testimony as proof of the alleged overt acts came from Adler. He was employed by the Company as a bookkeeper during the period when the counterfeit bonds were printed, i. e., between August and December 1961. Defendants attacked Adler's character at the trial. While relevant, it merely went to the weight to be given his testimony, particularly in view of the other evidence adduced by the Government.

2. He pleaded guilty below.

Adler testified that while working evenings in late September of 1961 he would have occasion to go to the rear of the print shop to discuss estimates with Joseph Mattia who was working with the defendants Raio and Perna. He said he heard them discussing "how they were going to go about making the bonds, the printing of the bonds." Adler said he saw Raio and Natale stripping, or laying out, the bond material which was to be photographed. He said Raio was doing the photography work and Natale was making the negatives. Adler testified that the actual printing of the bonds on the offset machines commenced in the latter part of November 1961. In this connection he said that defendant Mancinelli operated the offset press while Perna ran the numbering press. He stated further that the Mattias were present while these runs were being made. These operations at first were only in evenings but later also took place during the day.

We think the Government's evidence clearly justified a finding by the jury that all of these defendants worked on some one or more stages leading to the printing of the bonds.

We next consider whether the Government's evidence properly justified a finding that these defendants were aware that they were engaged in a counterfeiting operation. Such a showing was needed to satisfy the necessary element that they had a conscious purpose to further the conspiracy.

The defendant, Joseph Mattia, who managed the plant, was identified by Adler as the man who handled the contact with Segal, the individual who attempted to use the counterfeit bonds to secure a loan. Joseph Mattia on occasion brought the GMAC bond negatives in from the plant to show Segal. It was Joseph Mattia who instructed Adler to misfile the invoices for the paper used in printing the bonds. After an investigative visit of the F.B.I. agents in early 1962 he issued a threat to certain of these defendants and Adler that dire consequences would result if anyone talked about the

printing of the bonds. This evidence fully justified a finding that Joseph Mattia participated with full knowledge of the wrongful purpose of the operation.

We next consider the evidence on this score against the defendants Raio and Natale. Adler testified that he saw Raio doing the photography work on the bonds while Natale was making the negatives. The full significance of this testimony can only be realized when considered in conjunction with the mechanics by which these counterfeit bonds were made.

An expert witness for the Government, whose company makes GMAC's bonds, testified that authentic GMAC bonds are printed by the engraving process. In contrast, he stated that the bonds here were made by lithographic printing, which means that a negative plate is prepared by photographic means. He detailed the various steps in the printing of these bonds. First, a genuine bond is photographed. This is done in portions to get all the detail and to separate the colors. The portions are then pasted on a piece of transparent material until a composite picture is obtained. The material is then placed on a photo-sensitive plate. Light is passed through to the negative plate which then contains the desired picture. Three such plates were necessary here. These plates are then used in the press which actually prints the counterfeit bonds.

From the outline of the steps leading to the preparation of the negatives to be used in the printing of these bonds it is evident that Raio and Natale were fully conscious that they were preparing negatives of an authentic bond. They of course were aware that such negatives could be used to make copies by the lithographic method. Certainly it was a fair inference that they knew the plates were to be used in the plant to make copies.

We think the expert's testimony fully justified a finding that Raio and Natale were conscious participants in the creation of counterfeit bonds. This conclusion is given further support as to Raio by Adler's testimony that Perna and Raio just shook their heads when he

told them at an early stage in the operation that they were crazy for making bonds.

We next consider evidence of the defendant Perna's knowledge of the illicit nature of the activity. He of course operated the press on which the bonds were numbered. Adler testified that he heard Joseph Mattia discuss with Perna how they were to go about making the bonds. Perna also did not react when, early in the operation, Adler told him he was crazy to make the bonds. The Government's evidence was ample to justify the conclusion that Perna was conscious that he was participating in a wrongful project.

We come finally to Mancinelli, a full time employee of the Company. It was his fingerprint which was found on one of the seized counterfeit bonds. He operated the offset press which actually printed the bonds. The Government's expert testified that in order to print one of these bonds it would have to pass through the lithographic press three times, "Once for the purple on the face, once for the purple on the back, and once for the black text on the face." Of course, at this stage the bonds were not numbered but did contain signatures of certain agents of GMAC.

The jury was justified in concluding that Mancinelli knew he was making copies of an executed bond and that the negatives had been made in the Company's plant. When this is considered in the setting of this Company's operation and his necessary association with the activities of the others involved in this project, we think the Government made a sufficient case for jury consideration of Mancinelli's guilty participation.

We thus conclude that the evidence fully justified the jury in finding that all these defendants purposefully joined in an agreement to commit an unlawful act.

But these defendants argue that a criminal conviction cannot be sustained because there was no proof of an agreement to commit an offense against the United States. Thus, they argue that the Government's proof is not sufficient to prove beyond a reasonable doubt that an agreement existed among the conspirators to transport these bonds with fraudulent intent in interstate commerce.

■ It is true that there is no "direct" proof that these defendants intended that the bonds be transported in interstate commerce, but necessarily that is often a matter of inference in such cases. Here the bonds were printed in New Jersey with a provision that they were to be paid upon maturity in New York. From this provision the jury, which had the bonds before it, was reasonably justified in inferring that these defendants were aware that at some point they might be expected to become a part of interstate commerce. Certainly their connection with the various steps demonstrates that they had much more than a mere mechanical connection with the operation. Thus, all could fairly be charged by the jury with knowledge of such provision in view of the expert witness' testimony as to how the bonds were made. Nor is the identity of the Company named as the obligor in the bonds irrelevant to this issue in view of the evident interstate nature of its operation.

We are satisfied that the evidence properly supported the trial court's refusal to take the case from the jury at the close of the Government's case. Moreover, the defendants' evidence merely posed the issues for the jury and did not warrant a directed verdict. We are satisfied from the evidence and the law that the jury was fully justified in convicting these defendants of the offense charged.

These defendants next contend that the court erred in refusing to instruct the jury as follows:

"29. Although one may become a member of a conspiracy without full knowledge of all the details of the conspiracy, a person who has no knowledge of the conspiracy, but happens to act in a way which furthers some ob-

ject of the conspiracy does not thereby become a conspirator."

■ The trial judge refused to give this instruction because he stated that he had given it as part of the main charge. Defendants say that nowhere did the court charge the jury that if a defendant had no knowledge of a conspiracy's existence he should be acquitted even though his conduct could be found to have furthered the conspiracy. The Government contends that the trial court in substance did charge the appellants' theory of defense. Thus, it points out that the court charged that "If the parties acted together to accomplish something unlawful a conspiracy is shown." Again, for example, the court said:

"27. In every conspiracy there must be proof beyond a reasonable doubt that the persons named therein did knowingly participate and knowingly commit some act in furtherance of the objects of the conspiracy * * *"

We think the trial court's instructions covered the substance of defendant's requested charge and that no error was committed.

■ Finally, the defendants contend that the court erroneously charged that if the defendants violated 18 U.S.C. § 2314 they could be found guilty of conspiracy. Defendants say they could be found guilty of the substantive offenses without being guilty of a conspiracy. Since they were indicted only for conspiracy, defendants say it would appear from the charge that the jury could have erroneously convicted them of a crime other than the one for which they were indicted. Passing over the fact that no objection was made to the charge in the trial court, we think the court made it clear that it was talking only in the context of the conspiracy charge when he said to the jury:

"When defendants are charged with conspiracy, it is necessary to first establish the unlawful combination, that is, the sole offense with which these defendants are charged."

We find no error in the charge of the trial court.

■ We conclude that the judgment of conviction of these defendants must be affirmed.