**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**David BRUUN and Ronald Berkovitz,
Defendants-Appellants.**

**Nos. 85–1311, 85–1909.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 11, 1986.

Decided Jan. 13, 1987.

Rehearing Denied March 9, 1987
in No. 85–1311.

George P. Lynch, George P. Lynch, Ltd., Chicago, Ill., for defendants-appellants.

Sharon E. Jones, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before POSNER and COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

This is an appeal from judgments of conviction against the defendants on one count of conspiracy to commit offenses against

the United States, in violation of 18 U.S.C. § 371 (1982), and several substantive counts involving: (1) the transportation of stolen securities in interstate commerce in violation of 18 U.S.C. § 2314, (2) aiding and abetting the willful misapplication of the moneys, funds and credits of a federally insured bank in violation of 18 U.S.C. §§ 2 and 656, and (3) aiding and abetting the making of false entries in the books, reports, or statements of such a bank in violation of 18 U.S.C. §§ 2 and 1005. For the reasons stated herein, we will affirm in part and reverse in part.

## I.

Defendant Ronald Berkovitz met William Giova, a senior vice president in the commercial loan department of the First National Bank of Cicero ("FNBC"), a federally insured institution, in September or October of 1981. Berkovitz was a "loan broker," that is, a person who would refer borrowers to lending institutions for a fee. Giova had authority to approve loans by FNBC of up to $50,000, and his compensation from FNBC was in part a commission on the amount of loans that he processed. After the meeting, Berkovitz began to refer a number of brokered loans to Giova. Giova would generally inform FNBC when he was processing a brokered loan. Such loans generally present a greater risk to the lending institution than ordinary loans due to the fact that the borrowers who use such arrangements are typically poorer credit risks.

In early December of 1981, FNBC decided that it would no longer accept loans from Berkovitz. Giova was informed of this decision and relayed it to Berkovitz. However, Berkovitz continued to submit loans to Giova, who continued to process them. He did not inform FNBC of Berkovitz's involvement in the loans.

At about the same time, Giova decided to resign his position at FNBC and go into business with Berkovitz. In April of 1982,

he tendered his resignation, effective June 15.[1] He did not inform FNBC of his intention to work with Berkovitz. Giova processed a series of loans referred by Berkovitz in late 1981 and early 1982.

### A. Brokered Loans

The first of these loans was to Ezekiel Lopez, the owner of Lopez Construction Company. In November of 1981, Mr. Lopez spoke with Edward Bontkowski about obtaining a business loan of $20,000. Bontkowski referred him to Berkovitz and requested that he borrow an additional $15,000 to loan to Bontkowski. Berkovitz referred him to Giova for a loan of $45,000 ($10,000 of which was used to pay off a pre-existing mortgage on collateral used for the loan). Giova processed the loan, and on December 10, 1981, Berkovitz called Giova to request that the proceeds be issued in several checks, including one for $4,500 and one for $15,000. After this was done, Lopez endorsed the $15,000 check and turned it over to Bontkowski and endorsed the $4,500 check and turned it over to Giova. The $4,500 check represented Berkovitz's fee for arranging the transaction.

In February of 1982, the Taylor brothers, owners of a trucking concern, met with Berkovitz to try to obtain a $75,000 loan. Berkovitz referred them to Giova, with the understanding that they would pay Berkovitz $5,000 for the referral. Prior to processing the loans, Giova met with Berkovitz and informed him that the loans were above his lending limit and would thus require approval. Berkovitz suggested that Giova process two loans for less than $50,000 each, totalling $75,000. Giova processed a $40,000 loan for the Taylors on March 4, 1982 and a $35,000 loan on March 20, 1982. A false, backdated memorandum was prepared by Giova, indicating the bank's approval of a $75,000 line of credit for the Taylors. The Taylors used part of the proceeds to obtain a $5,000 cashier's

---

**1.** Giova had initially attempted to resign in late 1981, but the bank president persuaded him to remain.

check payable to Berkovitz from another bank. Berkovitz had told them not to get the check from FNBC or otherwise use his name there. Giova did not inform FNBC of Berkovitz's involvement in the transactions.

In December of 1981, Joseph Witkowski, a partner in Jordan-Whitney Construction Company ("Jordan-Whitney" or "the Company"), asked Ralph Rose, the owner of a currency exchange, whether Rose knew of anyone who could obtain a business loan for him. Rose referred Witkowski to Berkovitz. Witkowski and his partner, Rick Jordan, met with Berkovitz and asked him to obtain a $30,000–$35,000 loan. Berkovitz told them that they could get up to $100,000 if they wanted to, but they said that would be too much. Berkovitz gave them documents to complete and referred them to Giova. They met with Giova in early January, 1982, and signed a $33,000 note. As directed by Berkovitz, they deposited the proceeds of the loan in a newly opened checking account at FNBC and brought 10–15 signed, blank checks to Berkovitz. He wrote some of the checks to suppliers and retained the rest.

Witkowski later returned to Berkovitz and signed several FNBC judgment notes, which had been provided by Giova, for additional loans. Giova processed several loans from the judgment notes. Typically, he would receive a call from Berkovitz requesting an advance of a certain amount on the Jordan-Whitney line of credit. Giova would then process the loan[2] using a signed, blank judgment note forwarded by Berkovitz. Berkovitz told Giova that the Company had contracts with the City of Chicago that would provide additional collateral for the loans, and that FNBC would be named as co-payee on contract disbursements to the company. In fact, no such contracts existed.[3]

Several loans were obtained on the Jordan-Whitney account without the knowl-

edge of the Company from February 5 through May 24, 1982. These loans totaled over $170,000, and the bank was not adequately secured for this amount. Several of the Jordan-Whitney checks were also written and cashed without the knowledge of the Company. The bulk of the checks were written to a currency exchange, although some were written to James Adamczyk[4] or to a printing business owned by Adamczyk's father. Giova never informed FNBC of Berkovitz's involvement in the Jordan-Whitney loans, nor does Berkovitz's name appear in the bank records in connection with the transactions. In all, the total debt of Jordan-Whitney to FNBC exceeds $200,000.

**B. Loans Involving Stolen Securities**

On February 25, 1982, Berkovitz called Giova and told him that Edward Bontkowski would be coming to the bank the following day to obtain a loan using bearer bonds as collateral. Part of the loan proceeds was to be used to pay chattel mortgage loans that Bontkowski had at FNBC, and the remainder was to be used to acquire property for Bontkowski's business. Bontkowski signed a note for $370,000 and presented as collateral bearer bonds issued by the Industrial Development Corporation of Corpus Christi, which had a market value of approximately $480,000 (the "Corpus Christi Bonds"). On Berkovitz's instructions, Giova disbursed $122,000 of the loan proceeds in the form of five cashier's checks in amounts ranging from $20,000 to $35,000 and credited the remainder to Bontkowski's account. Later that day, Berkovitz instructed Giova to make an additional advance of $100,000 against the bonds, and Giova did so.

The Corpus Christi Bonds had been stolen from Lewco Securities Corporation in New York on February 10, 1982. However, the theft of the bonds was not en-

---

**2.** Some of the loans were processed by another loan officer, at Giova's direction.

**3.** There is some confusion in the record on this point, but Witkowski testified that he had never

had any contracts with the City. The jury was entitled to credit this testimony.

**4.** Adamczyk was also named as a defendant in the indictment.

**402**

tered into the Securities Information Center database, a computerized registry for information concerning stolen stocks and bonds, until February 23, 1982. In early February, Berkovitz and Albert Rabin, who were both FBI informants, had separately reported to FBI agent Spinelli, their usual contact, that stolen bonds from New York were available in the Chicago area for 20–30% of their face value. Spinelli checked with the Securities Information Center about the Corpus Christi Bonds and informed Berkovitz and Rabin that the bonds had not been reported as stolen. On February 18, Berkovitz and Rabin informed Spinelli that the bonds were no longer available for sale.

### C. Involvement of Defendant Bruun

In late 1981 or early 1982, Giova called David Bruun, an attorney he had dealt with since the 1970's, and told him that he would like to introduce him to a potential "superclient," i.e., Berkovitz. They met with Berkovitz at his apartment. Berkovitz described some of his business affairs and told Bruun to keep whatever services he might perform in the strictest confidence.

They met again and Berkovitz further described his current and potential business enterprises. He told Bruun that he and Giova would go into business together after Giova left FNBC. Berkovitz promised Bruun a retainer and annual fees of $60,000–$80,000 per year, which represented roughly a doubling of Bruun's annual income. Berkovitz told Bruun that his first assignment would be to act as borrower for a loan against certain unidentified collateral that would be taken to FNBC. Berkovitz further admonished Bruun not to "advertise" the fact that he was representing Berkovitz or his companies.

In early March, Giova told Bruun that the collateral had arrived and that he should come to FNBC to sign the necessary papers. Bruun went to FNBC on March 11, 1982, and Giova showed him the collateral, which consisted of 99 Intermountain Power Agency bearer bonds with a market value of approximately $488,750. Giova took Bruun to the office of Joseph Schuessler, the President of FNBC, and directed Schussler's secretary to "check" the bonds. She returned and reported that the bonds were "okay." Bruun signed a collateral receipt for the bonds and a judgment note for $325,000 secured by the bonds. The purpose of the loan was represented as speculation in the gold market.

Bruun opened a client-trust checking account entitled the "David Bruun Trust Account," and the loan proceeds were credited to it. He drew three certified checks on the account on March 11 and 12. Two were to one Mrs. St. Angelo for a total of $45,000, and one was to himself for $20,000. The checks to Mrs. St. Angelo were used to purchase a boat for Berkovitz and Giova.

A similar procedure was followed for other loans, which were secured by shares of common stock in the Coca-Cola company; Gelco Corporation; UAL, Inc.; and Xerox Corporation, by bearer bonds of the New Jersey Health Care Facilities Financing Authority, and by additional bonds of the Intermountain Power Agency. The value of the collateral and the principal amount of the loans eventually exceeded $1.3 million. On at least one occasion, Giova made a loan on the Bruun account and wrote checks against the proceeds, signing Bruun's name to both the note and the checks.

Checks on the Trust Account totalling more than $1.3 million were written and endorsed by Bruun. These checks were typically cashed by Adamczyk, Paul Babian, Bontkowski, or Vic Falzone at currency exchanges where the owners did not report transactions in excess of $10,000. This non-reporting was in violation of federal law. The owners of the exchanges charged two to three times the maximum statutory fee allowed by Illinois law for cashing the checks.

Bruun himself received a total of $28,000 from the account, $10,000 of which was a loan. None of the money Bruun received from the Trust Account was recorded by him as legal fees. His net business income for 1982 was reported as $30,000.

On June 8, 1982, Berkovitz called Giova to say that he needed an additional advance of $150,000, which was to be secured by the assignment of bearer bonds and coupons. The transaction was to be handled by John Flynn, a director at FNBC, but Flynn did not want to make the loan to Bruun. In fact, FNBC wanted to eliminate the Bruun loans altogether because the large amount of the loans was impairing its liquidity. Giova told Flynn that Bruun had interest coupons redeemable at the end of June in an amount that would exceed the loan advance. Flynn agreed to talk with Bruun. In their meeting, Bruun told Flynn that the money was needed for a margin call. Although Flynn said that FNBC would release the collateral to allow Bruun to get a loan from another bank, Bruun told him that this procedure would require too much time. Flynn finally agreed to make the loan for twenty days. After he had made the loan, Flynn examined the collateral and noted the name of the transfer agent for the bonds. In a telephone conversation with the transfer agent, Flynn discovered that the bonds had been stolen. It was subsequently determined that all of the securities used to secure the Bruun loans had been stolen.

### D. Indictment and Trial

Defendants Berkovitz and Bruun, along with Giova, Bontkowski, Rabin, Adamczyk, Babian and Wade, were indicted by a grand jury in a multi-count indictment charging conspiracy to commit offenses against the United States, in violation of 18 U.S.C. § 371, and several substantive counts involving: (1) the transportation of stolen securities in interstate commerce, (2) misapplication of the moneys, funds and credits of a federally insured bank, and (3) the making of false entries in the books, records and statements of such a bank.[5] Giova pled guilty to some of the counts and was not tried on the others. Berkovitz and Bruun were tried together, despite their motions for severance, which the district court continued until the close of the case and then denied. Additionally, both moved to dismiss the indictment on the basis that it was duplicitous and stated multiple conspiracies in a single count. Bruun filed a motion *in limine* to exclude statements he had made to the FBI and an Assistant United States Attorney, which motion was also denied.

Both defendants moved for acquittal at the close of the government's case, and these motions were denied. Also at the close of the government's case, the government dismissed the stolen securities counts against Bruun. Bruun then presented a defense consisting of stipulations and live testimony, including his own. Berkovitz neither testified nor offered any other witnesses.

The jury returned a verdict of guilty on all remaining counts. The defendants filed motions for a judgment of acquittal or a new trial. In these motions, they renewed the issue of governmental misconduct, which had been continued from their pretrial motions. Both posttrial motions were denied.

Bruun was sentenced to one year each on counts one (conspiracy), five (misapplication), and six (misapplication), to be served concurrently, and to two years probation on counts seven through nine (misapplication), to run concurrently with each other,

---

5. 18 U.S.C. § 656 provides, in pertinent part:
   Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank, or a receiver of a national bank, or any agent or employee of the receiver, or a Federal Reserve Agent, or an agent or employee of a Federal Reserve Agent or of the Board of Governors of the Federal Reserve System, ... willfully misapplies any of the moneys, funds or credits of such bank ... shall be fined not more than $5,000 or imprisoned not more than five years, or both. . . .
   Because the substantive banking crimes can only be committed by certain specified officials, the defendants other than Giova were charged with aiding and abetting the offense, in violation of 18 U.S.C. § 2(a), which provides, "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

but consecutively to the one-year sentence on the other counts. Berkovitz was sentenced to serve five years each on count one (conspiracy), counts five through seventeen and nineteen (misapplication), and count twenty (false entries). He was also sentenced to ten years on each of counts two through four (interstate transportation of stolen securities). All of those sentences were to run concurrently. He also was sentenced in 82–CR–004–1, a case in which he had been convicted of a similar bank fraud and placed on probation by the United States District Court for the Western District of Pennsylvania. His probation had been transferred to the Northern District of Illinois, and, subsequent to his conviction on the charges involved in this case, Judge Plunkett revoked his probation and sentenced him to five years, to run consecutively with the sentence imposed in this case. For reasons which will become obvious, we will analyze the defendants' claims separately.

## II. No. 85–1909

Defendant Berkovitz raises a number of challenges to his conviction. He claims that there was insufficient evidence to support his convictions under the substantive counts. With regard to the conspiracy count, he claims that there was a fatal variance between the indictment and proof, that the count was duplicitous, and that there was a misjoinder under Fed.R. Crim.P. 8. Additionally, he contends that the district court's refusal to grant a severance was an abuse of discretion in light of his and Bruun's "mutually antagonistic"

**6.** 18 U.S.C. § 2314 provides, in pertinent part:
Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud ... Shall be fined not more than $10,000 or imprisoned not more than ten years, or both....

**7.** For example, Berkovitz had informed Spinelli that there were stolen financial instruments in Chicago from New York, and that they could be purchased for 20% to 30% of their face value. In some cases, Berkovitz came into possession of the securities within days of their theft. *See also* discussion at part II. E. *infra.* Finally, the

defenses. Finally, Berkovitz contends that his conviction must be reversed as a result of outrageous conduct on the part of the government. We agree that there was insufficient evidence as to the counts involving interstate transportation of stolen securities, but we find his other contentions to be without merit. Therefore, we will reverse his convictions on counts two through four (interstate transportation of stolen securities), but we will affirm his convictions on count one (conspiracy), counts five through seventeen and nineteen (misapplication) and count twenty (false entries).

### A. Interstate Transportation of Stolen Securities

Counts 2, 3, and 4 of the indictment charged that Berkovitz "transported and caused to be transported" in interstate commerce certain securities on February 18, March 11, and March 26, 1982, "knowing the same to have been stolen, converted and taken by fraud," in violation of 18 U.S.C. § 2314.[6] Berkovitz argues that the evidence adduced at trial does not support his convictions on these counts. We agree.

■ The evidence was quite clearly enough to support a finding that Berkovitz knew that the securities he was using as collateral for the loans were stolen,[7] but that is not sufficient to support a conviction for violating § 2314. Berkovitz was *not* indicted for knowing receipt or negotiation of stolen securities, which would have been punishable under 18 U.S.C. § 2315,[8]

surreptitious nature of the loan transactions for which the securities served as collateral also firmly supports the conclusion that Berkovitz was well aware of the illegal status of this property. *See United States v. Gallo,* 543 F.2d 361, 363–64, 367–69 (D.C.Cir.1976); *United States v. Smith,* 502 F.2d 1250, 1255 (5th Cir.1974).

**8.** 18 U.S.C. § 2315 provides, in pertinent part:
Whoever receives, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, or pledges or accepts as security for a loan any goods, wares, or merchandise, or securities, of the value of $500 or more, moving as, or which are a part of, or

but rather for transporting them, or causing their transportation in interstate commerce. The receiver of an item is not, by virtue of that fact alone, considered to have transported it in interstate commerce.

The government might have been able to provide the requisite causal link had it shown that Berkovitz brought or induced another to bring the securities to Chicago, but it did not do so. In fact, the government conceded at oral argument before us that no such proof was made. Nonetheless, the government contends that the fact that the securities were delivered in Chicago a short time after their theft in New York, along with Berkovitz's knowledge that they were received from someone who did not hold valid title, supplies the missing proof. At oral argument, the government pressed the theory that, by providing a ready market for the stolen securities, Berkovitz "caused" their transportation. We cannot agree, for to do so would obliterate the distinction between § 2314 and § 2315. *See United States v. Greer*, 467 F.2d 1064, 1068 (7th Cir.1972), *cert. denied*, 410 U.S. 929, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973).

Furthermore, while interstate commerce has been broadly defined in other contexts, *see, e.g., Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), this is a criminal action, which calls for precision in terminology. An individual must be adequately informed of the nature of the offense. Under the facts of this case, we cannot say that a conviction for transporting or causing the transportation of stolen securities was supported by evidence which, at best, showed knowing receipt of stolen securities. Therefore, Berkovitz's

convictions on counts 2, 3 and 4 are reversed.[9]

### B. Variance Between Indictment and Proof—Single vs. Multiple Conspiracies

Berkovitz's essential contention is that there were multiple conspiracies, rather than a single, overall conspiracy. He claims that this resulted in a variance between the indictment and proof, which prejudiced him and rendered the joinder of the separate counts improper under Fed.R. Crim.P. 8.[10] We disagree.

As an initial matter, it appears to us that there was in fact a single conspiracy, the object of which was to defraud FNBC. That the means used to accomplish this goal were varied does not change the result. The gist of a conspiracy is an agreement among the conspirators to commit an offense, attended by an act of one or more of them to effect the object of the conspiracy. *Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942); *United States v. Falcone*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940); *see also United States v. Percival*, 756 F.2d 600, 606–09 (7th Cir.1985); *United States v. Ras*, 713 F.2d 311, 314–15 (7th Cir.1983); *United States v. Greer*, 467 F.2d 1064, 1071 (7th Cir.1972), *cert. denied*, 410 U.S. 929, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973); *United States v. Varelli*, 407 F.2d 735, 741–42 (7th Cir.1969), *appeal after remand, United States v. Saletko*, 452 F.2d 193 (1971), *cert. denied*, 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1972). The scope of the agreement determines the scope of the conspiracy, *Varelli*, 407 F.2d

which constitute interstate or foreign commerce, knowing the same to have been stolen, unlawfully converted, or taken ... Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

**9.** Nor can the government sustain Berkovitz's conviction on the theory that he "aided and abetted" the interstate transportation of the stolen securities. *See Greer*, 467 F.2d at 1068. In any event, the indictment did not charge this offense, and the jury does not appear to have been instructed on it.

**10.** The arguments that joinder was improper and that there was a variance between indictment and proof are somewhat inconsistent with one another. The first assumes that multiple conspiracies were alleged, albeit improperly joined in a single count, and the second assumes that a single conspiracy was alleged, but multiple conspiracies were proven. We will treat these arguments as having been made in the alternative.

at 742, and there may be a single conspiracy even though the commission of two or more offenses is contemplated. *Braverman*, 317 U.S. at 53, 63 S.Ct. at 102. The allegation in a single count of a conspiracy to commit several crimes is not duplicitous. *Id.* at 54, 63 S.Ct. at 102; *United States v. Knox Coal Co.*, 347 F.2d 33, 39 (3d Cir.), *cert. denied*, 382 U.S. 904, 86 S.Ct. 239, 15 L.Ed.2d 157 (1965); *United States v. Lutwak*, 195 F.2d 748, 753 (7th Cir.1952), *aff'd on other grounds*, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953).

■ Proper joinder is determined from the face of the indictment. *United States v. Harrelson*, 754 F.2d 1153, 1176 (5th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 277, 88 L.Ed.2d 241 (1985); *United States v. Bledsoe*, 674 F.2d 647, 655 (8th Cir.), *cert. denied*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982). Therefore, if the indictment charged a single conspiracy, joinder was proper notwithstanding the fact that the evidence at trial showed multiple conspiracies. *See United States v. Sutherland*, 656 F.2d 1181, 1190 n. 6 (5th Cir.), *cert. denied*, 455 U.S. 949, 991, 102 S.Ct. 1451, 1617, 71 L.Ed.2d 663 (1981). We believe that such a single conspiracy was alleged by the indictment in the instant case,[11] even if the government proved multiple conspiracies at trial.

More importantly, even if there were multiple conspiracies, Berkovitz has failed to show that either the variance between the indictment and proof, or the joinder of the counts prejudiced him in any way.

■ It is clear that reversal for improper joinder is not required if the error was harmless. An error involving misjoinder requires retrial only if it results in actual prejudice because it had a substantial and injurious effect or influence in determining the jury's verdict. *United States v. Lane*, —— U.S. ——, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). Here, quite clearly, any erroneous joinder was harmless. Even if there were, as Berkovitz contends, multiple "wheel" conspiracies, the evidence showed clearly that he was at the hub of each. *Cf. United States v. Levine*, 546 F.2d 658, 662 (5th Cir.1977) (When unrelated transactions involving several defendants are joined together it cannot be said that all defendants would not be prejudiced.). We note that *Levine* adopted a *per se* prejudice standard for joinder errors, and thus has been effectively overruled by the Supreme Court's recent decision in *Lane*.

■ Any variance between the indictment and proof was harmless for a similar reason. While the charging of one conspiracy where the evidence shows multiple conspiracies is error, *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), the error is harmless where the defendant is shown to have been a member of each of the allegedly separate conspiracies. *United States v. Noble*, 754 F.2d 1324, 1330 (7th Cir.), *cert. denied*, ——

---

11. The conspiracy count charged, in pertinent part:

> [D]efendants herein, wilfully and knowingly did combine, conspire, confederate and agree together and with other persons known and unknown to the grand jury, to commit offenses against the United States, namely:
>
> a) To transport and caused [sic] to be transported in interstate commerce, ... securities of a value in excess of $5,000, knowing the same to have been stolen, converted and taken by fraud, in violation of Title 18, United States Code, Section 2314;
>
> b) To make false entries in the books, records and statements of the First National Bank of Cicero with intent to injure and defraud said bank, in violation of Title 18, United States Code, Section 1005;

> c) To wilfully misapply the moneys, funds, and credits of the First National Bank of Cicero, with intent to injure and defraud said bank, in violation of Title 18, United States Code, Section 656; and
>
> d) To knowingly and wilfully commit extortion, which extortion would affect interstate commerce, by demanding the payment of money under fear of economic harm, in violation of Title 18, United States Code, Section 1951.

Whether the facts at trial showed otherwise or not, the face of the indictment quite clearly alleges that all of the substantive criminal offenses were part of the same conspiracy.

U.S. ——, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985); *United States v. Chamley,* 376 F.2d 57, 60 n. 5 (7th Cir.), *cert. denied,* 389 U.S. 898, 88 S.Ct. 221, 19 L.Ed.2d 220 (1967); *see also United States v. Lindsey,* 602 F.2d 785, 787 (7th Cir.1979) (fact that defendant could not have been part of overall conspiracy charged did not require reversal unless he was prejudiced by submission of overall conspiracy theory to jury). As we have noted, the evidence overwhelmingly showed that, if separate conspiracies were involved, Berkovitz was at the hub of each. In such a situation, the error, if any, was harmless.

### C. Refusal to Grant a Severance

■ A related, but distinct, issue is whether the district court should have granted Berkovitz's motion for a severance under Fed.R.Crim.P. 14, in light of Bruun's defense that he was merely following Berkovitz's instructions and was unaware of any illegal activity, i.e., that he was "conned" by Berkovitz.[12] A refusal to grant a severance will be disturbed on appeal only if it results in manifest and substantial prejudice; in other words, it is reviewable only for abuse of discretion. *United States v. Gironda,* 758 F.2d 1201, 1220 (7th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985); *see also United States v. Shively,* 715 F.2d 260, 267 (7th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984); *United States v. Sotomayor,* 592 F.2d 1219, 1227–28 (2d Cir.), *cert. denied,* 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979). Such prejudice cannot be shown here.

■ Berkovitz argues that his defense and that of his codefendant were "mutually antagonistic." However, such a claim will only justify severance if the defenses "con-

flict to the point of being irreconcilable and mutually exclusive," *Shively,* 715 F.2d at 268 (quoting *United States v. Crawford,* 581 F.2d 489, 491 (5th Cir.1978)), so that "acceptance of one defendant's defense will preclude the acquittal of the other defendant." *Gironda,* 758 F.2d at 1220.

■ The defenses in this case show little antagonism at all, much less the sort of drastic conflict that would justify our interfering with the district court's exercise of its sound discretion. Berkovitz contended that the government failed to prove him guilty beyond a reasonable doubt; Bruun contended that the guilt, if any, belonged to Berkovitz rather than him. In *Gironda,* we rejected a contention that a defense based on non-participation in a conspiracy was inconsistent with a defense that the government failed to prove its case, even if one defendant's counsel made a remark in opening argument that implied the existence of a conspiracy. 758 F.2d at 1220 (citing *United States v. Petullo,* 709 F.2d 1178 (7th Cir.1983)).[13] Those authorities are controlling here. While there was no doubt some hostility and finger pointing during the joint trial, this alone is insufficient to justify granting a severance. *See United States v. Harris,* 542 F.2d 1283, 1313 (7th Cir.1976); *United States v. Hutul,* 416 F.2d 607, 620–21 (7th Cir.1969), *cert. denied,* 396 U.S. 1012, 90 S.Ct. 573, 24 L.Ed.2d 504 (1970).

Two defendants are rarely pleased to be prosecuted together. The incidents to which Berkovitz refers were isolated events during a three-week trial. The district court conducted the proceedings in a manner that minimized prejudice and jury confusion, giving proper limiting instructions to focus the jury's attention on the proof that could be considered against one defendant, but not the other. Under these

---

**12.** A Rule 14 motion assumes that the initial joinder was proper, though alleging joint trials would be prejudicial. A Rule 8 motion, on the other hand, contends that initial joinder is improper. Thus, if no Rule 8 motion were made, a Rule 14 motion might, in some circumstances be viewed as a waiver of the Rule 8 issue. However, we do not rely on waiver here because defendant's motion to dismiss the indictment adequately raised the duplicity issue.

**13.** We note that many of the specific remarks by Bruun's counsel to which Berkovitz points as demonstrating actual prejudice were not objected to below.

circumstances, we cannot say that the refusal to grant a severance was an abuse of discretion.

### D. Sufficiency of the Evidence

#### 1. Aiding and Abetting the Misapplication of Bank Funds

■ Berkovitz challenges his conviction on the misapplication counts (counts 5–17, 19), not because there was insufficient evidence that he aided and abetted Giova. Instead, he contends that there was insufficient evidence that Giova misapplied bank funds. This contention is without merit. As we have noted before, an appellant who challenges the sufficiency of the evidence to sustain a jury verdict of conviction bears a heavy burden; we may only overturn such a verdict where the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. *United States v. Redwine,* 715 F.2d 315, 319 (7th Cir.1983), *cert. denied,* 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984) (citing *United States v. Garcia,* 562 F.2d 411, 414 (7th Cir.1977), and *Brandom v. United States,* 431 F.2d 1391, 1400 (7th Cir.), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 634 (1970)); *see also United States v. Reynolds,* 801 F.2d 952, 954 (7th Cir.1986) (evidence reviewed in light most favorable to government and verdict sustained if *any* rational trier of fact could have found guilt beyond a reasonable doubt). Berkovitz has not sustained this burden.

■ The evidence that Giova misapplied bank funds is, in a word, overwhelming. A bank officer misapplies funds when, *inter alia,* he converts funds to his own use or that of a third party, lends money to a fictitious borrower, causes a loan to be made to his own benefit while concealing his interest from the bank, or violates state law or bank policy. *See, e.g., United States v. Mohr,* 728 F.2d 1132, 1134 (8th Cir.), *cert. denied,* 105 S.Ct. 148, 83 L.Ed.2d 87 (1984); *United States v. Shively,* 715 F.2d 260, 265–66 (7th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S. Ct. 1001, 79 L.Ed.2d 233 (1984); *United States v.*

*Krepps,* 605 F.2d 101, 103 (3d Cir.1979); *United States v. Twiford,* 600 F.2d 1339, 1341 (10th Cir.1979). The evidence shows that Giova engaged in a continuing course of conduct involving several types of misapplication, with the aid and at the direction of Berkovitz.

The fact that Giova and Berkovitz continued to process brokered loans through FNBC long after the bank had instituted a policy of not taking such loans from Berkovitz, while taking steps to conceal this fact from the bank, would alone be sufficient to sustain the conviction. Additionally, however, Berkovitz actually suggested a scheme that would allow Giova to make loans above his lending limit. Giova also made loans from which he received a portion of the proceeds and loans to a business that he was planning to join, a *per se* misapplication. *Shively,* 715 F.2d at 265. Finally, although he did not cause the interstate transportation of the securities, Berkovitz clearly knew that they were stolen. Their use to obtain loans from the bank was clearly a misapplication of its funds, and one for which, ultimately, the bank will be out of pocket.

■ Berkovitz's argument seems to be that, in spite of all of the above mentioned acts, Giova lacked the requisite intent to injure FNBC. However, the "intent to injure" required by § 656 is not a subjective desire that the bank be harmed. Rather, it is sufficient that the loan officer engaged in acts, the natural tendency of which would be to injure the bank. *United States v. Thomas,* 610 F.2d 1166, 1174 (3d Cir.1979); *United States v. Farrell,* 609 F.2d 816 (5th Cir.1980); *see also United States v. Angelos,* 763 F.2d 859, 861 (7th Cir.1985) (intent sufficient where officer acts in contravention of bank policy and his conduct posed a serious risk of harm to the bank). In sum, the intent required to make out a criminal misapplication of bank funds is minimal. *United States v. Hansen,* 701 F.2d 1215, 1218 (7th Cir.1983). The evidence was more than sufficient to sustain the conviction.

### 2. Making of False Entries

██ Finally, Berkovitz claims that the evidence was not sufficient to convict him of aiding and abetting the making of false statements and entries in FNBC's records, a violation of 18 U.S.C. § 1005, in connection with the Taylor loans (count 20). In connection with this loan, Berkovitz suggested to Giova that two loans be made to disguise the fact that the loan to the Taylors exceeded Giova's lending limit. Even if Berkovitz's contention that he was unaware of the false memorandum approving a $75,000 credit line to the Taylors and of the misstatements of assets attributable to them was credible—and we believe the jury was entitled to infer otherwise—his assistance to Giova in making loans in excess of his lending limit, and concealment of the fact from FNBC, was clearly sufficient to support the conviction.[14]

### E. Outrageous FBI Conduct

██ Finally, Berkovitz argues that the conduct of the FBI in this case was so outrageous as to preclude his conviction. *See Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1641, 48 L.Ed.2d 113 (1976); *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). In those cases, the possibility was left open that, even though a defendant might not be able to assert an entrapment defense (due, for example, to his predisposition to commit the crime), in some situations the government's conduct might be "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Russell*, 411 U.S. at 431–32; 93 S.Ct. at 1643; *see also Hampton*, 425 U.S. at 491–95, 96 S.Ct. at 1650–53 (Powell, J., concurring).

This circuit has likewise recognized this possibility. *United States v. Belzer*, 743 F.2d 1213, 1216–21 (7th Cir.1984), *cert. denied*, 469 U.S. 1110, 105 S.Ct. 788, 83 L.Ed.2d 781 (1985); *United States v. Thoma*, 726 F.2d 1191, 1198–99 (7th Cir.), *cert.*

*denied*, 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984); *United States v. Kaminski*, 703 F.2d 1004, 1009–10 (7th Cir. 1983). However, to date we have not yet found conduct which was sufficiently outrageous to warrant the invocation of a due process bar. *See United States v. Podolsky*, 798 F.2d 177, 181 (7th Cir.1986). Indeed, according to our research, cases which have applied the outrageous conduct—due process defense to reverse a conviction are quite rare.

However, even assuming that we would one day do so, as the above cases have noted, where no independent constitutional right is violated "governmental misconduct must be truly outrageous before due process will prevent conviction of the defendant." *Kaminski*, 703 F.2d at 1009; *see also Belzer*, 743 F.2d at 1217; *Thoma*, 726 F.2d at 1198. In this case, it is clear that the "misconduct" of the government, if any, falls far short of that which would justify reversal of the convictions.

Berkovitz's primary argument is that the government misled him into thinking that the securities used as collateral for the loans were not stolen. The record simply does not support this contention. When Berkovitz told agent Spinelli that there were stolen bonds available for purchase in Chicago, Spinelli checked to see if they had been *reported* as stolen and, truthfully, told Berkovitz that they had not. Berkovitz was in no way led to believe that the bonds were not *in fact* stolen. Upon learning that they had not yet been reported stolen, Berkovitz immediately told Spinelli that they were no longer available. In fact, they were used by Bontkowski as collateral for a loan just a few days later. The logical inference was that Berkovitz moved quickly to take advantage of the delay involved in the reporting of securities thefts. This inference was further reinforced by the rapidity with which subsequent transactions involving stolen securities were effected.

---

**14.** Additionally, as with the other loans, the status of the loan as a brokered loan was concealed from FNBC. We believe that the jury was entitled to infer that this was done with the encouragement of, if not at the behest of, Berkovitz.

In any event, Spinelli's statements, at most, tended to negate Berkovitz's knowledge that the bonds were stolen. We have already held that there was ample evidence to sustain a conviction on this point. Furthermore, the statements were made only in connection with the securities used to obtain the Bontkowski loan. Agent Spinelli was in no way connected with the Taylor, Lopez, or Jordan-Whitney loans, or with the later loans in which stolen securities were used. In sum, this is not a case where the government "manufactured" a crime and then sought to punish it. *Cf. United States v. Twigg*, 588 F.2d 373 (3d Cir.1978) (outrageous conduct found where government supplied nearly all the materials and expertise for an illegal drug manufacturing operation and was sole customer of defendants), *limited by, United States v. Beverly*, 723 F.2d 11 (3d Cir.1983) (*per curiam*).[15]

## III. No. 85–1311

Although defendant Bruun raises a number of challenges which are similar to those raised by defendant Berkovitz, the facts of his case place him in a materially different position. Accordingly, we reverse his conviction on count one (conspiracy) and counts seven through nine (misapplication). As to two of the misapplication counts (counts five and six), however, we affirm.

### A. Conspiracy

Bruun contends that there was insufficient evidence of his participation in the conspiracy. We agree. "In order to establish the crime of conspiracy, the government must prove [1] that there was an agreement between two or more persons to commit an unlawful act, [2] that the defendant was a party to the agreement, and [3] that an overt act was committed in furtherance of the agreement by one of the co-conspirators." *United States v. Noble*, 754 F.2d 1324, 1328 (7th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985). It is on the second of these elements that the government's case against Bruun faltered.

■■■ Bruun asserts, correctly, that there was no evidence linking him to any of the transactions other than the Bruun loans or any evidence that he was aware that the securities used as collateral for those loans were anything but legitimate. While it is not necessary for the government to prove that an alleged conspirator was aware of every aspect of the conspiracy, it must show that he was aware of the essential nature and scope of the enterprise and intended to participate in it. *United States v. Conroy*, 589 F.2d 1258, 1269 (5th Cir.), *cert. denied,* 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979); *see also United States v. Garcia*, 562 F.2d 411, 414 (7th Cir.1977) (association with conspirators, knowledge of conspiracy and presence during conspiratorial discussions insufficient absent evidence that defendant joined and participated in the conspiratorial scheme) (dictum); *United States v. Netterville*, 553 F.2d 903, 911 (5th Cir.) (government must prove knowing participation), *cert. denied,* 434 U.S. 861, 98 S.Ct. 189, 54 L.Ed.2d 133 (1977); *United States v. Mattia*, 379 F.2d 725, 729 (3d Cir.) (same), *cert. denied,* 389 U.S. 846, 88 S.Ct. 100, 19 L.Ed.2d 113 (1967). This the government has failed to do.[16]

---

**15.** Because of our view of the record, we need not decide whether the defense would be made out if Spinelli in fact led the defendant to believe that the securities were not stolen. However, we note that most challenges to "outrageous" government conduct involve the conduct of the actual investigation of the crimes charged. That is not the case here. Of course, we express no opinion whether government misconduct that is unrelated to the investigation of the charged offenses may be sufficient in some cases to invoke the defense.

**16.** Because the knowing participation in the conspiracy by the accused is an essential element, the government must prove it beyond a reasonable doubt. *United States v. Arredondo-Morales,* 624 F.2d 681 (5th Cir.1980). The government's contention that once a conspiracy is proven only slight evidence is necessary to connect the accused to it is not correct. *See Gov't Br.* at 27 (citing *United States v. West,* 670 F.2d 675 (7th Cir.), *cert. denied,* 457 U.S. 1124, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982)). In *West,* we were addressing the quantum of proof required to sustain admissibility of a coconspir-

It is possible that the government showed that Bruun participated in a much smaller conspiracy to misapply bank funds, involving only himself, Berkovitz and Giova (*see infra* § III. B.), but the indictment did not charge such a conspiracy. We cannot say that such a variance was harmless. The activities of Berkovitz and Giova were wide ranging and reprehensible. At trial, the jury heard evidence of those activities, even though Bruun was not shown to have had any connection to them. Under these circumstances, we cannot say that the possibility that guilt would be transferred from Berkovitz to Bruun was not substantial. *See United States v. Lindsey*, 602 F.2d 785, 788–89 (7th Cir.1979).[17]

### B. Aiding and Abetting the Misapplication of Bank Funds

██ Bruun also claims that the evidence was insufficient to support his conviction for aiding and abetting the misapplication of funds of a federally insured bank. Like Berkovitz, he claims that the government did not make out a substantive violation by Giova. For the reasons stated in part II. D. of this opinion, we reject this contention. However, Bruun also challenges his conviction on the ground that the government did not show that he, Bruun, had the requisite criminal intent. As to counts seven through nine, we agree.

To be liable as an aider and abettor, Bruun must have shared Giova's criminal intent. *United States v. Pope*, 739 F.2d 289, 291 (7th Cir.1984); *United States v. Barclay*, 560 F.2d 812, 816 (7th Cir.1977). In the indictment, the government charged that Bruun aided and abetted in Giova's misapplication by obtaining loans in his name, when:

a) the named borrower, defendant DAVID BRUUN, was not and would not be the true beneficiary of the loan, was not the actual owner of the collateral, and had no right to pledge the collateral; [and]

b) the other beneficiaries were and would be defendants WILLIAM GIOVA, RONALD BERKOWITZ [sic], and JAMES ADAMCZYK ...

However, as the government conceded at oral argument, there was no evidence that Bruun knew that the securities were stolen. Thus, he believed that they were the property of Berkovitz and he had been given authority to pledge them. Additionally, there was no evidence that he was aware of FNBC's unwillingness to deal with Berkovitz.

Under these circumstances, we do not believe the government was entitled to a conviction on the theory that Bruun aided and abetted the misapplications that occurred because the money was loaned to him for Berkovitz or because the collateral for the loans was stolen. The mere fact that he obtained the loans for an undisclosed third party would not have made out a criminal misapplication of bank funds. *See United States v. Shively*, 715 F.2d 260, 265 (7th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984) (citing *United States v. Gallagher*, 576 F.2d 1028, 1045–46 (3d Cir.1978) and *United States v. Gens*, 493 F.2d 216, 222 (1st Cir.1974)). This is especially true because Bruun always told the bank that he was acting on behalf of a client, even though that client's identity was not disclosed. Nor would the use of the securities as collateral have been a misapplication had the securities not been stolen. Because his

---

ator's declarations as an exception to the hearsay rule. We did not hold that proof by anything less than a reasonable doubt was required to sustain a conviction, and to do so would be inconsistent with *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *see also Patterson v. New York*, 432 U.S. 197, 204–05, 208, 97 S.Ct. 2319, 2324, 2326, 53 L.Ed.2d 281 (1977).

**17.** We realize that there is some tension between this holding and the holding in part II. of

the opinion that there was a single, overall conspiracy, but we do not believe that they are irreconcilable. We do believe that there was a single conspiracy to defraud FNBC through a number of means; we merely hold here that defendant Bruun was not a part of it. To phrase our holding in terms of defendant Berkovitz's wheel analogy, the "rim" of the wheel is not missing, but one of the "spokes" (Bruun) is not connected to it.

acts would have been entirely innocent had the facts been as he supposed them to be, Bruun lacked the shared criminal intent required to convict him of aiding and abetting. *United States v. Barker,* 546 F.2d 940, 946 (D.C.Cir.1976); *United States v. Byrd,* 352 F.2d 570, 572 (2d Cir.1965).

■ However, on some of the counts, the government's theory was that Bruun aided and abetted the misapplications whereby Giova diverted funds for his own use.[18] As we have noted earlier, this was a *per se* misapplication of bank funds. *Shively,* 715 F.2d at 265. Nor can there be any contention that Bruun was unaware that this was happening. He admitted in his testimony that he signed checks to the owner of a boat, knowing that Giova was purchasing an interest in the boat with the funds. Furthermore, he testified to leaving signed checks with Giova in an amount in excess of $20,000. These acts were sufficient, and were done with sufficient knowledge, to sustain his conviction on the counts to which they relate.

The evidence shows that these transactions allowed Giova to divert a portion of the proceeds of two of the Bruun loans to himself. The boat purchase appears to have been out of the proceeds of the first loan, charged in count five of the indictment. The cash that was given directly to Giova appears to have also been out of that loan, as well as the second and third loans (March 26 and April 6), the latter of which is charged in count six of the indictment.[19] Therefore, conviction was proper as to counts five and six.[20]

IV.

For the reasons stated above, the convictions of the defendant Berkovitz on counts two, three and four are REVERSED, and his convictions on all other counts are AFFIRMED. The convictions of the defendant Bruun on counts five and six are AFFIRMED, and his convictions on all other counts are REVERSED. The cause is remanded for resentencing on those counts as to which the convictions were affirmed.[21]

18. The government pressed two additional theories at oral argument and in its brief: 1) That Bruun misrepresented the purpose of the loans as to purchase a position in gold, when he in fact knew that they were being used for other purposes, and 2) that Bruun himself received nearly $30,000 of the proceeds without recording it as legal fees. However, neither of these theories was presented by the indictment. The second theory is actually inconsistent with the indictment, in that the indictment charged that the loans were made with Bruun as the purported beneficiary when he in fact was not. We have serious doubt that the former would amount to a misapplication in any event, as we are aware of no case which holds that a borrower and a loan officer engage in a misapplication of bank funds when they misrepresent the purpose of an apparently completely secured loan. However, we need not reach the merits of either of those theories, because the indictment did not give fair notice of them. Additionally, we note that the government does not appear to rely on the misrepresentation theory in its brief.

19. Those portions of the transcript which refer to these payments are not a model of clarity. In Bruun's testimony on cross-examination, he referred to a number of government exhibits consisting of photocopies of checks. Unfortunately, the exhibits which are relevant to the direct payments to Giova do not appear in the record on appeal. Indeed, it is unclear whether the exhibits themselves were admitted. However, Bruun testified to payments made to Giova on the same day as loans to Bruun. We believe the jury was entitled to infer that the payments were from the proceeds of the loans made on those dates.

20. Bruun raises a number of other contentions regarding the admission of certain evidence. Specifically, he contends that it was error to admit evidence of the discussions he had with the FBI and United States Attorney because they were plea negotiations. He further contends that the district court erred when it allowed an FBI agent to speculate about Bruun's state of mind, and by allowing admission of Giova's guilty plea without an immediate limiting construction. Finally, he contends that the jury was not properly instructed on the attorney client privilege.

Our disposition of his case makes it unnecessary for us to consider these contentions. Most of them relate to the conspiracy conviction, which we have reversed. On the misapplication counts on which we have affirmed, there was really no conflict in the testimony. Accordingly, there is no reasonable possibility that any of the alleged errors affected the verdict on those counts.

21. On remand, the district court is, of course, free to exercise its discretion in sentencing on

the counts on which defendants were properly    convicted.