**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Debra A. HARTMANN, Kenneth K. Kaenel, and John Scott Korabik, Defendants–Appellants.**

**Nos. 90–1658, 90–1659 and 90–1660.**

United States Court of Appeals, Seventh Circuit.

Argued May 15, 1991.

Decided March 19, 1992.

---

Joel D. Bertocchi, Asst. U.S. Atty. (argued), Crim. Div., Barry R. Elden, Asst. U.S. Atty., Crim Receiving, Appellate Section, Office of U.S. Atty., Chicago, Ill., for plaintiff-appellee U.S.

Samuel V.P. Banks, Terrence P. LeFevour (argued), Law Offices of Samuel V.P. Banks, Chicago, Ill., for defendant-appellant Deborah A. Hartmann.

Julius L. Echeles (argued), Chicago, Ill., for defendant-appellant Kenneth K. Kaenel.

Cynthia Giacchetti (argued), Chicago, Ill., Michael H. Saken, Wheeling, Ill., for defendant-appellant John S. Korabik.

Before BAUER, Chief Judge, COFFEY and FLAUM, Circuit Judges.

BAUER, Chief Judge.

In the early evening of June 8, 1982, Werner Hartmann, the owner of a successful stereo sales business in Chicago's northern suburbs, was brutally murdered

in his home in Northbrook, Illinois. The following morning, police found Werner's bullet-ridden body sprawled naked in a second-floor bedroom. After years of investigation, Werner's wife Debra Hartmann, her lover at the time of the murder, John Scott Korabik, and Korabik's friend and associate Kenneth K. Kaenel, were charged in a thirty-count superseding indictment with violations of 18 U.S.C. §§ 2, 1341, and 1343 (mail and wire fraud), and 2314 (interstate transportation of funds obtained by fraud) (1988). The indictment essentially charged the three defendants with devising a scheme to defraud various insurance companies of the proceeds of life and mortgage insurance policies covering Werner. The indictment alleged that the defendants caused Werner's murder as part of the scheme.

After a three-week trial, the jury found Debra guilty of all counts charged in the indictment, and Korabik and Kaenel guilty of mail and wire fraud. The district court sentenced the three defendants to long prison terms: Debra received a term of 22 years, while Korabik and Kaenel received terms of 16 years and 20 years, respectively. Each defendant also was sentenced to five years of probation following the prison term. On appeal, the defendants raise numerous challenges to their convictions and sentences. Finding no merit in these challenges, we affirm.

## I.

This miserable tale of greed and murder began in 1978 when Werner married Debra, whom he met while she worked at a tavern called the Smoker's Club. After the marriage, Debra's standard of living rose materially; her union with Werner presented her with the trappings of luxurious living including furs, fine jewelry, and expensive automobiles. Yet, by 1981, Debra and Werner's marriage began to deteriorate. Debra had begun an open affair with Korabik, who worked as a part-time tennis pro and clerk in a gun store. By the end of 1981, Werner, who was aware of his wife's infidelity, contemplated divorce and even consulted an attorney. But soon after his initial consultation, Werner told the attorney that he did not wish to proceed further with the divorce. At the same time, in January 1982, Debra also contacted a divorce attorney, and even filed a formal divorce petition. But after meeting with her lawyer a second time, Debra also requested that her lawyer take no further action on her petition.

By the end of January 1982, Debra had moved in with Korabik at his father's house in Chicago. Kaenel also lived with Korabik's father, occupying a second-floor bedroom across the hall from the room where Korabik and Debra stayed. At trial, the government showed how these three individuals conspired to receive insurance proceeds fraudulently by murdering Werner Hartmann. Thus, the receipt of the insurance proceeds was the real aim of killing Werner.

In order to accomplish this fraud, Debra and Korabik brought Harvey Loochtan into their scheme. Loochtan, who later pleaded guilty to mail fraud and testified at the defendants' trial, was an agent for the Prudential Insurance Company. In June 1981, Loochtan met with Werner and Debra and sold them a $150,000 double-indemnity policy insuring Werner's life, and a corresponding policy on Debra's life. Werner and Debra each listed the other as beneficiary of their policies. Premiums on the policies were due on a quarterly basis, but after one quarter both lapsed for nonpayment. The policy on Debra's life remained lapsed, but the one on Werner's life—with Debra as beneficiary—was reinstated in January 1982. The government offered the testimony of a forensic document examiner who stated that Werner's signature on the reinstatement application had been forged. *See* Transcript of Proceedings at Trial ("Trial Trans.") at 1330–35.

In March 1982, Werner met with Loochtan about the purchase of another policy. Loochtan delivered an application for a $250,000 double-indemnity policy to Werner and arranged for Werner to take a physical. Werner told Debra's brother, in Debra's presence, that he was buying this

policy for his daughter's benefit. *See id.* at 1392–93. A few days later Debra visited Loochtan and told him that she wanted to be the beneficiary on Werner's new policy. She placed $3000 on Loochtan's desk to ensure that she would be listed as beneficiary. *See id.* at 738–39. Loochtan took the money and completed the application listing Debra as beneficiary. *See id.* During the next two months, Debra and Korabik made several visits to Loochtan's office to check on the status of the policy application. The policy was approved by the Prudential Insurance Company on May 7, 1982, and returned to the agent for delivery to the policyholder. Loochtan had until June 7, 1982, to send the new $250,000 policy to Werner. *See id.* at 707. Soon after Werner received the new policy, he called Loochtan and told him that his daughters, not Debra, should be the beneficiaries of the policy. Loochtan promised to send the proper forms, and then immediately called Debra and told her of Werner's request. *See id.* at 755–57.

On the evening of June 8, an unidentified assailant fired at least fourteen shots into Werner from an automatic weapon. The government introduced evidence to support two theories: that Korabik killed Hartmann and that Kaenel killed Hartmann. According to the government, one was willing to kill for his love of Debra; the other for his love of money. *See id.* at 58. Government witnesses testified that both Korabik and Kaenel admitted after the murder that they had done the killing. Moreover, the government produced a thirteen-year-old witness who lived in the house next door to Werner's Northbrook home. This witness told the jury that he observed a man, 6 feet tall or taller, slender and athletically built, running from the back of Werner's house carrying a gym bag. This identification could describe the tall, athletic Korabik who was known to carry guns in a gym bag.

The government introduced other evidence that connected Kaenel to Werner's murder. For instance, there was evidence that Kaenel unsuccessfully solicited various people to "do a hit" on an older man who was married to a younger, pretty woman. *See id.* at 1276–77. Kaenel informed the would-be hit-men that they would share a large sum of money for the murder, but would not receive the full amount of their fee until the wife collected the insurance proceeds. When these potential assassins declined to do a hit on credit, Kaenel became agitated and complained that Korabik would keep all the money if Kaenel did not provide some help with the murder. *See id.* at 985–86.

Nevertheless, both Korabik and Kaenel provided alibi testimony to show that, at the time Werner was being murdered, Kaenel was home with his wife and Korabik was enjoying dinner at his friends' house. There was no dispute that, on the evening of the murder, Debra was at local restaurant with Werner's first wife and daughter.

Perhaps the most chilling evidence was the testimony from various witnesses that Werner feared he would be murdered. Several witnesses testified that, prior to his murder, Werner had expressed fear that his wife and her lover were planning to kill him. Apparently, Werner expressed these fears to his attorney, and even attempted to hire police officers as personal bodyguards. *See id.* at 1808, 1851–52.

After Werner's worst fears were realized, Debra took possession of his home in Northbrook, Illinois, another of Werner's homes in Deerfield, Illinois, his cars, and his parcel of land in Barrington Hills, Illinois. Korabik moved in with Debra at the Northbrook house. In January 1984, Debra received a payment of $450,000 from the Prudential Insurance Company in settlement of her claims. By September of that year, Debra had broken off her relationship with Korabik. On January 19, 1989, almost seven years after Werner's murder, the Special April 1987 Grand Jury of the Northern District of Illinois indicted Debra, Korabik, and Kaenel.

## II.

On appeal, the defendants each challenge various aspects of their convictions and sentences. We consider each defendant's claims in turn.

## A. Debra Hartmann

Debra argues that the district court committed two fundamental errors that denied her a fair trial. Debra first maintains that the government failed to prove beyond a reasonable doubt that she had the specific intent to defraud. Specifically, Debra claims that the government, "with the exception of the unreliable statements of [several] witnesses, did not present one bit of evidence which even remotely connected Debra Hartmann to Werner's murder." Brief for Appellant Debra Hartmann ("Debra's Brief") at 13. Second, Debra argues that the district court improperly admitted irrelevant evidence that prejudiced the jury. Debra identifies four instances in which the district court wrongly admitted evidence that should have been ruled inadmissible. We are not persuaded.

■ Debra's claim that her conviction is not supported by sufficient evidence ignores the substantial direct and circumstantial evidence of her participation in the scheme to kill Werner and collect the insurance proceeds. Her argument is merely a challenge to the credibility of "unreliable" government witnesses, an argument that is "wasted on an appellate court." *United States v. Beverly*, 913 F.2d 337, 358 (7th Cir.1990). We must uphold Debra's conviction if, viewed in the light most favorable to the government, the evidence is such that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). *See also United States v. Draiman*, 784 F.2d 248, 251 (7th Cir.1986). We need only recall the parade of government witnesses who linked Debra to the mail and wire fraud scheme that, among other things, caused Werner's death in order to conclude that Debra's conviction must be affirmed. Debra's only response to the wealth of evidence against her is her contention that "[e]ach piece of allegedly damning evidence ... had an equally plausible innocent connotation." Debra's Brief at 13. Such credibility determinations are for the jury to decide. *See Draiman*, 784 F.2d at 251 ("In

reviewing sufficiency of the evidence at this distance from the trial we must give deference to the jury's weighing of the evidence and its drawing of reasonable inferences."). In the instant case, the jury found the government's evidence credible, and we see no reason to disturb that determination.

■ As part of her sufficiency of the evidence claim, Debra argues that the government specifically failed to present reliable evidence that she intentionally killed Werner. Debra maintains that, because Illinois law requires a finding that she intentionally and unjustifiably killed Werner before she can be denied insurance proceeds in a civil action, she cannot be found guilty of criminal fraud unless that same intent determination is made. *See, e.g.,* Debra's Brief at 15 ("Even if Debra Hartmann had shot Werner point blank, in cold blood in the presence of one hundred witnesses, she would still be within her legal right to claim those proceeds until some court said otherwise. The Government's case is not saved by the guilty verdict."). Debra apparently seizes upon the inability of the government to prove who pulled the trigger. Debra contends that, without finding that she intentionally killed Werner, "a fraud on the insurance companies is an impossibility as a matter of law." *Id.* at 16.

To support her argument that the Illinois law which governs the receipt of insurance proceeds demonstrates the government's failure of proof in this case, Debra cites *State Farm Insurance Co. v. Smith*, 66 Ill.2d 591, 6 Ill.Dec. 838, 363 N.E.2d 785 (1977), and *Lincoln National Life Insurance Co. v. Johnson*, 669 F.Supp. 201 (N.D.Ill.1987). Both cases interpret Illinois law in civil suits over insurance proceeds. In *Smith*, the Illinois Supreme Court held that a conviction is not required to bar recovery, but a finding that the beneficiary intentionally and unjustifiably killed the insured is required. 6 Ill.Dec. at 840, 363 N.E.2d at 787. In *Johnson*, the federal district court held that a beneficiary, who had been found not guilty of his father's murder by reason of insanity, was entitled

to share insurance proceeds because the other beneficiary did not prove that he was sane at time of the killing. 669 F.Supp. at 205.

While these cases represent good law in civil insurance actions, they are simply inapposite to the issues raised in the instant appeal. *Smith* and *Johnson* represent after-the-fact civil suits that seek to divide insurance proceeds. Neither case deals with criminal fraud. Debra's opponent in the instant case was not a party who sought to preclude recovery; it was the United States Government, which sought to convict her of criminal fraud. Debra fails to show any logical link between these civil determinations concerning the prerequisites for receiving insurance proceeds and the question presented in this case, namely, whether she devised a mail and wire fraud scheme. The district court properly instructed the jury about the elements of mail fraud:

> To sustain the charge of mail fraud, the government must prove the following propositions: First, that the defendant knowingly participated in the scheme to defraud ...; second, that for the purpose of carrying out the scheme or attempting to do so, the defendant used the United States mails or caused the United States mails to be used in the manner charged in the particular count; and third, that the defendant did so knowingly and with intent to defraud. If you find from your consideration of all of the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty.... When the word "knowingly" is used in these instructions, it means that the defendant realized what he or she was doing and was aware of the nature of his or her conduct and did not act through ignorance, mistake or accident.

*See* Trial Trans. at 2817–18. The district court provided a similar instruction regarding wire fraud. *See* Trial Trans. at 2819–20. *See also United States v. Mizyed*, 927 F.2d 979, 982 (7th Cir.) (discussing elements of mail fraud), *cert. denied*, —— U.S. ——, 111 S.Ct. 2065, 114 L.Ed.2d 470

(1991). With these thorough instructions guiding the jury's deliberations and the ample evidence connecting Debra to Werner's murder, we see no merit in Debra's challenge to her mail and wire fraud convictions.

■ Debra's evidentiary arguments fare no better. Debra points to four pieces of evidence that she claims should not have been admitted. First, Debra maintains that the admission of Loochtan's guilty plea arising from the same mail fraud scheme impermissibly shifted the burden of proof to Debra to prove her innocence. *See* Debra's Brief at 21. The admission of a witness' guilty plea is an evidentiary ruling within the discretion of the trial judge. *United States v. Sanders*, 893 F.2d 133, 136–37 (7th Cir.), *cert. denied*, 496 U.S. 907, 110 S.Ct. 2591, 110 L.Ed.2d 272 (1990). *See also United States v. Mealy*, 851 F.2d 890, 898 (7th Cir.1988).

In the instant case, it is clear that the district court did not abuse that discretion. At the close of the case, the court instructed the jury that Loochtan's plea was "not to be considered as evidence against the defendants." *See* Trial Trans. at 2815. Debra can cite no argument or incident that supports her contention that the admission of Loochtan's guilty plea shifted the burden of proof. On the contrary, the district court made it perfectly clear that the government had the burden of proving the defendants' guilt. *See* Trial Trans. at 2812.

■ Nevertheless, Debra suggests that the district court's limiting instructions may not have cured the prejudicial effect that Loochtan's plea had on the jury. Debra cites *Bruton v. United States*, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968), in which the Supreme Court stated that instructions, no matter how emphatically given by the district court, may not always be enough to eliminate undue prejudice. The instant case, however, is very different from *Bruton*. In *Bruton*, the Court faced "powerfully incriminating extrajudicial statements of a co-defendant ... [who] does not testify and cannot be

tested by cross-examination." *Id.* at 135–36, 88 S.Ct. at 1627–28. Here, we have the direct testimony of Harvey Loochtan who merely informed the jury from the witness stand that he chose to plead guilty to the charges against him. Loochtan was available for cross-examination, and the district court took pains to cure any unwarranted prejudice that his admission may have caused. Thus, Debra fails to persuade us that the *Bruton* rule is implicated here. The district court, therefore, did not abuse its discretion.

Debra challenges the admission of three additional pieces of evidence: the forensic description of the manner in which Werner was murdered; Werner's out-of-court statements that articulated his fear of being killed; and several statements by the government during closing argument. Like the admission of Loochtan's guilty plea, the district court's decisions to admit these pieces of evidence will only be reversed for an abuse of discretion. *See United States v. Briscoe,* 896 F.2d 1476, 1489–90 (7th Cir.1990). None of Debra's challenges can pass that standard.

■ Debra argues that she was denied a fair trial in violation of the Due Process Clause of the Fifth Amendment when the government presented several witnesses who testified about the brutal manner in which Werner was slain. Debra maintains that once it was established that Werner indeed was murdered, any additional forensic evidence was irrelevant to the charges outlined in the indictment, specifically mail fraud, wire fraud, and the interstate transportation of stolen property. Debra cites *Ferrier v. Duckworth,* 902 F.2d 545, 548 (7th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 526, 112 L.Ed.2d 536 (1990), to support her claim that "a trial in which the prosecution uses irrelevant evidence to enrage the jury against the defendant [is] the quintessence of an unfair trial." Specifically, Debra objects to the admission of the testimony of Dr. Robert Stein, the Cook County Medical Examiner, who gave a detailed analysis of Werner's gunshot wounds. Debra also complains about the testimony of Northbrook Police Officer James Wilson and Evidence Technician Neil Calanca who both described what they observed when they investigated the gruesome scene of Werner's murder.[1]

Debra's argument, however, ignores the significance of the manner of Werner's death. The district court properly found the details of Werner's death relevant to the issues on trial. Both Kaenel and Korabik made out-of-court admissions regarding Werner's death in which each described the murder in some detail. Korabik told Debra's brother that he shot Werner four times in the back, and then stood over the fallen body and emptied his gun into Werner's lifeless form. *See* Trial Trans. at 1408–10. This testimony matched the evidence presented by the government's forensic witnesses who described the four entrance wounds in Werner's back and the "stippling" (i.e. burnt and unburnt gunpowder on the skin) which indicated that the murderer shot Werner at point-blank range. *See* Trial Trans. at 1440–44. Similarly, Kaenel once admitted that he shot Werner fourteen times—only one bullet less than was actually recovered by the government's investigators. Thus, the details of Werner's murder provided corroboration—and enhanced the credibility—of the out-of-court admissions of Korabik and Kaenel. The forensic evidence, therefore, was relevant and probative; it was well within the district court's discretion to admit it.

■ Debra's most compelling challenge to the district court's evidentiary rulings involves the admission of Werner's out-of-court, beyond-the-grave statements about the dismal state of his marriage (including the adulterous acts of his wife), his desire to change beneficiaries on his insurance policies, and most notably, his fear of being murdered by his wife and her lover. *See,*

---

1. Debra also claims that "gory photographs of Werner's body ... had no relevance to any issue in the case." *See* Debra's Brief at 28. Yet, the photographs were never shown to the jury. Thus, we will focus our remarks on the detailed analysis of Werner's injuries that was presented to the jury.

*e.g.,* Trial Trans. at 205–06, 441–43, 545–46. Debra maintains that the admission of these statements violated the Confrontation Clause of the Sixth Amendment and thereby denied her a fair trial. *See* Debra's Brief at 30–31. We note that all three defendants, Debra, Korabik, and Kaenel, claim that the district court improperly admitted Werner's statements.

Because the defendants failed to object to the admission of Werner's statements, we must give even more deference to the district court's ruling. Prior to trial, the district court invited the defendants to provide detailed objections to the admission of any evidence the government proposed, specifically Werner's declarations. The district court stated, "We have not yet been furnished any compelling objections to the Werner Hartmann statements the government seeks to introduce." *See* Record Doc. 211 at 6. Yet when the statements were offered at trial, the defendants made no objection. "To preserve an issue for appellate review, a party must make a proper objection at trial that alerts the court and opposing party to the specific grounds for the objection." *United States v. Wynn,* 845 F.2d 1439, 1442 (7th Cir.1988) (citing *United States v. Laughlin,* 772 F.2d 1382, 1391–92 (7th Cir.1985)). An objection is proper only if it is timely made and "appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context...." Fed.R.Evid. 103(a)(1). Thus the defendants have waived the opportunity to challenge the admission of Werner's statements unless that admission constitutes plain error. *Id. See also Laughlin,* 772 F.2d at 1392; Fed.R.Crim.P. 51 and 52. "A plain error is one that results in an actual miscarriage of justice." *Wynn,* 845 F.2d at 1442 (quoting *United States v. Silverstein,* 732 F.2d 1338, 1349 (7th Cir.), *cert. denied,* 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1984)).

■ In the instant case, the district court did not commit plain error in admitting Werner's statements. The record discloses that each of the challenged statements, where offered for the truth of the matter asserted, was admissible under recognized exceptions to the hearsay rules. Werner's statements that described his marriage to Debra and his desire to change the beneficiaries of his insurance policies were admissible under Fed.R.Evid. 803(3) as statements of Werner's then existing state of mind, emotion, or physical condition. These statements were relevant and probative to the government's proposition that Werner Hartmann would not have listed Debra as beneficiary of his insurance policies. Because we previously have recognized that hearsay is admissible under 803(3) in order to establish a deceased declarant's state of mind that is inconsistent with the declarant voluntarily taking certain action, *see United States v. Green,* 680 F.2d 520, 523 (7th Cir.), *cert. denied,* 459 U.S. 1072, 103 S.Ct. 493, 74 L.Ed.2d 635 (1982), we have no trouble finding an absence of plain error here. *See also* 4 J. Weinstein and M. Berger, *Weinstein's Evidence* § 803(3)[03], p. 803–112 (1990); 6 J. Chadbourn, *Wigmore on Evidence* § 1730 (1976).

■ Werner's statements that he feared Debra and Korabik would murder him were also properly admitted. The district court admitted these statements under Fed. R.Evid. 803(3) to prove Werner's attitude toward his insurance policies; that is, if Werner feared that his wife and her lover were planning to kill him, it would be extremely unlikely that Werner deliberately would make his murder even more attractive by naming his wife as beneficiary to lucrative policies that insured his life.

■ Moreover, some of Werner's statements that described his fears were admitted properly under other hearsay exceptions. For instance, shortly before his death, at the time when Werner made final arrangements with Loochtan about the $250,000 policy—the same time that Debra bribed Loochtan to list her as beneficiary— Werner spoke separately with two lawyers, Louis Aldini and Richard Colombik. Aldini testified that Werner told him that he (Werner) had overheard Debra and Korabik plotting his murder. *See* Trial Trans. at 1807–09. Evidently, Werner wanted to know what he should do to gather evidence

against Debra and Korabik before going to the authorities. Then the day before his murder, Werner told Colombik that, for some unknown reason, he had been unable to remove Debra as the beneficiary of his insurance. Werner also told Colombik that Debra and her boyfriend were going to kill him. *See* Trial Trans. at 544–46. Both Aldini and Colombik testified that, when Werner made these statements, he was in a state of panic. *See id.* at 1808, 546.

Because Werner's statements concerned startling events—his belief that Debra and Korabik were planning to murder him—and because Werner noticeably was upset and excited about the plot he had just overheard, the district court did not commit plain error by admitting these statements as excited utterances under Fed.R.Evid. 803(2).[2] In *United States v. Moore*, 791 F.2d 566, 570 (7th Cir.1986), we outlined the three conditions necessary for an excited utterance: "(1) a startling event or condition occurred; (2) the statement was made while the declarant was under the stress of excitement caused by the event or condition; and (3) the statement relates to the startling event or condition." The record contains ample support for each of the three conditions: surely, hearing one's wife and lover plotting one's own death is a startling event; both Aldini and Colombik testified that Werner was under the stress of excitement caused by overhearing Debra and Korabik plot his murder; and Werner's statements directly related to his having overheard the plotters. Thus, the district court did not commit plain error in admitting Werner's statements.[3]

██ The defendants also challenge the admission of Werner's statements to several confidants that he devised a scheme to fool Debra and Korabik into believing that Werner owed "juice loans" to the "mob."

Apparently, Werner concocted this story, with the help of friend Jeff Joseph, in order to deceive Debra and Korabik so that Korabik would loan money that Werner had no intention of repaying. The government proved the existence of this "scam" by more than just Werner's hearsay declarations. Jeff Joseph testified that he helped Werner carry it out by calling Debra at Werner's request and telling her that Werner was being held until he made payments on the loans. Joseph testified that the "scam" ultimately extracted $5000 from Debra and Korabik. *See* Trial Trans. at 473–79.

Under Fed.R.Evid. 803(3) and *Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892), Werner's declared intent to carry out the "juice loan scam" was admissible to show intent to execute the plan as well as to prove that he, in fact, carried out that plan. Rule 803(3) allows the admission of "statement[s] of the declarant's then existing state of mind, ... (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." In *Hillmon*, the Supreme Court held that statements of a declarant's future intent are admissible to show that the declarant acted in conformity with his intention. 145 U.S. at 295, 12 S.Ct. at 912. *See also United States v. Donley*, 878 F.2d 735 (3rd Cir.1989), *cert. denied*, 494 U.S. 1058, 110 S.Ct. 1528, 108 L.Ed.2d 767 (1990) (statements evincing a plan to deceive spouse were admitted to establish both that declarant intended to carry out the plan and that she did so).

This authority demonstrates that Werner's statements were properly admitted. Like his claims of an unhappy marriage, assertions by Werner that described his

---

**2.** Fed.R.Evid. 803(2) provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

 • • • • •

 (2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

**3.** The government alternatively argued that Werner's statements regarding his fear of being murdered also were admissible under the "residual clause" of the hearsay rule, Fed.R.Evid. 804(b)(5). Because we hold that it was not plain error to admit these statements as excited utterances, we need not resolve the government's residual clause contention.

plan to obtain money from Debra and Korabik by deception contradicted any intent on Werner's part to make Debra the recipient of his munificence. Werner's plan—and its successful execution—also provided a powerful motive for Korabik to join the conspiracy to murder Werner and receive the financial benefits resulting from Werner's death. Thus, under the authority provided by Rule 803(3), *Hillmon,* and its progeny, the district court did not commit plain error by admitting Werner's statements about his "juice loan scam."

In response, Korabik maintains that the government introduced the "juice loan scam" statements to contradict Korabik's defense that Werner had been killed because he failed to repay the loans. We note that Korabik presented this defense, at least in part, by his interpretation of Werner's hearsay statements regarding the loans. *See* Trial Trans. at 2475–77. While the government concedes that it had no intention of offering Werner's plan to rebut Korabik's defense that the loans were real, *see* Government's Brief at 29, there is no reason why the statements could not be seen as relevant for this purpose. Thus, Korabik's use of Werner's statements simply provides an additional ground for their admission.

Lastly, Debra claims that the government's closing arguments denied her a fair trial. Specifically, Debra maintains that the prosecutors made personal attacks on her defense counsel, deliberately misstated the evidence and the law, vouched for the credibility of the Government's witnesses, and improperly stated their own personal opinions of the evidence. In *United States v. Howard,* 774 F.2d 838 (7th Cir.1985), we annunciated our standard of review for claims of prosecutorial misconduct:

> In evaluating claims of prosecutorial misconduct, this court has consistently employed the well-settled standard of review that we are to consider the prosecutor's conduct not in isolation, but in the context of the trial as a whole, to determine if such conduct was so inflammatory and prejudicial to the defendant ... as to deprive him of a fair trial.

*Id.* at 848 (quotations omitted). *See also Mealy,* 851 F.2d at 903 ("[E]ven if the prosecutor engaged in improper conduct, we must re-examine the improper remark in light of the entire record to determine whether the remark deprived the defendant of a fair trial." (quoting *United States v. Swiatek,* 819 F.2d 721, 730 (7th Cir.), *cert. denied,* 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987)).

■ Debra identifies several instances of misconduct in the government's closing arguments. Yet because none of these instances drew an objection, we review her claims only for plain error, the "most egregious and prejudicial of errors." *Howard,* 774 F.2d at 848 n. 8. After carefully reviewing the record, we find that none of Debra's challenges amounts to plain error. On the contrary, we find nothing inherently improper in the government's arguments to the jury. For instance, Debra claims that the prosecution personally attacked defense counsel by arguing that the defense told a "whopper" and that they (the defense) attempted to confuse the jury by claiming that the government did not know what its theory of the case was. *See* Trial Trans. at 2776–77. Yet it is clear from the plain language of the transcript that these remarks were directed at the arguments made by defense counsel and not at the character of the attorneys themselves. The distinction is simple: the prosecution argued that certain statements were lies, not that the attorneys were liars.

■ Similar kinds of distinctions can be made for Debra's other claims of misconduct. Debra claims that the prosecution improperly vouched for its witnesses and expressed personal opinions. Yet, a close reading of the record reveals that, at the instances Debra cites, the prosecutor only addressed the circumstances under which the government interviewed witnesses during the investigation. The prosecutor limited his comments to circumstances and did not express a personal opinion as the effects of the circumstances on the truthfulness of the testimony. *See* Trial Trans. at 2774–75. Such comments do not amount to plain error. *See United States v. Kramer,*

711 F.2d 789, 795 (7th Cir.) (not improper for prosecutor to discuss during opening and closing arguments conditions that support the credibility of its witnesses), *cert. denied,* 464 U.S. 962, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983).

 Finally, Debra claims that the prosecution improperly offered a personal opinion about Korabik's testimony. In response to defense counsel's pleas to the jury to believe Korabik's testimony, the prosecution asked rhetorically, "Did you think Mr. Korabik was going to get on the stand and say: Oh, yes I did it? Do you think Mr. Korabik wants the prison sentence he so richly deserves?" Trial Trans. at 2766. Debra argues that this remark improperly offered the prosecutor's personal belief that Korabik deserved to go to prison. Debra cites *Phelps v. Duckworth,* 757 F.2d 811 (7th Cir.), *reh'd on other grnds.,* 772 F.2d 1410 (7th Cir.1985) (*en banc*). In *Phelps,* the prosecutor commented that he "wouldn't ask anybody to send anyone to prison for life unless [he] thought it was richly deserved, and unless [he] thought it was necessary for this community." We held that this comment was beyond the scope of proper argument. 757 F.2d at 824. Yet, the comments in *Phelps* and the rhetorial question in the instant case are patently different. There the prosecutor explicitly offered his personal opinion; here, the comment carried no more personal character than an argument that the defendant was guilty and should pay for his crimes. The prosecutor's rhetorical question only sought to point out how a potential prison term might affect Korabik's testimony. We do not find that the prosecutor's question constituted plain error. Thus, we hold that Debra's claims are without merit.

## B. John Scott Korabik

In addition to his complaint about the district court's admission of Werner Hartmann's statements that we already have resolved, Korabik presents nine other claims of error that he asserts require the reversal of his conviction. We do not find this shot-gun approach to appellate review persuasive. Seeing no merit in Korabik's claims, we discuss only his most potent arguments and simply dismiss the others.

 Korabik claims that the district court first erred by failing to grant his motion for severance. (Defendant Kaenel raises the identical claim.) Korabik argues that each defendant's case was antagonistic to his co-defendant's claims, and therefore, significant prejudice resulted from a joint trial. Korabik claims that the conflicts between each defense permeated the trial and forced Korabik to face three prosecutors, the government, Debra, and Kaenel, instead of just one. *See* Korabik Brief at 8–9. All defendants filed pretrial motions for severance under Fed.R.Crim.P. 14. The district court denied the motions, finding that the proposed defenses were not sufficiently antagonistic to warrant separate trials. We note that we will overturn a district court's ruling on severance only upon a showing that the district court abused its discretion. *United States v. Farmer,* 924 F.2d 647, 652 (7th Cir.1991) (citing cases). *See also United States v. Tedesco,* 726 F.2d 1216, 1217 (7th Cir.1984) ("Denial of a motion for severance will only be reversed for an abuse of discretion, which requires a showing of compelling prejudice.").

In *United States v. Buljubasic,* 808 F.2d 1260, 1263 (7th Cir.), *cert. denied,* 484 U.S. 815, 108 S.Ct. 67, 98 L.Ed.2d 31 (1987), we announced the test for severance due to antagonistic defenses:

> Unless the defenses are so inconsistent that the *making* of a defense by one party will lead to an unjustifiable inference of another's guilt, or unless the acceptance of a defense *precludes* acquittal of other defendants, it is not necessary to hold separate trials.

(Emphasis in original.) The latter ground mentioned in this excerpt has been referred to as the "mutually antagonistic defenses" test. *See United States v. Ziperstein,* 601 F.2d 281, 285 (7th Cir.1979), *cert. denied,* 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980). Mutual antagonism, as interpreted in the case law, implies a conflict in defenses that is "irreconcilable and mutually ex-

clusive." *United States v. Shively,* 715 F.2d 260, 268 (7th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984). Put simply, defenses are not mutually antagonistic unless they are "so irreconcilable that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *United States v. George,* 477 F.2d 508, 515 (7th Cir.), *cert. denied,* 414 U.S. 827, 94 S.Ct. 155, 38 L.Ed.2d 61 (1973). This standard requires that "acceptance of one defendant's defense will preclude the acquittal of the other defendant." *United States v. Bruun,* 809 F.2d 397, 407 (7th Cir.1987) (citations omitted).

■■ From this review of the case law, it becomes clear that the district court did not abuse its discretion by denying the defendants' motions for separate trials. The record reveals that the defenses raised were mere finger-pointing, a strategy that does not warrant severance. *Bruun,* 809 F.2d at 407 ("While there was no doubt some hostility and finger-pointing during the joint trial, this alone is insufficient to justify granting a severance."). To understand the failure of the Korabik and Kaenel defenses to justify separate trials, we must remember that the defendants were charged not with murder, but with devising and executing a fraud scheme, which included killing Werner Hartmann. As the government argues, that the defenses of Korabik and Kaenel attempted to cast responsibility for Werner's murder on one another in no way precludes either defendant from being acquitted of fraud. *See* Government's Brief at 35.

Both Korabik and Kaenel claimed that the other had shot Werner. Yet, they were charged with fraud; their guilt for the crimes in the indictment did not depend upon the actual identity of the triggerman. Moreover, Korabik and Kaenel could not offer any substantial evidence to support these accusations. The closest that either defendant came to offering proof that the other killed Werner was one of Korabik's witnesses who testified that she observed a large car, possibly a Lincoln, drive out of the Hartmann driveway at approximately 10 p.m. the night Werner died. But Kora-

bik neglected to offer any evidence linking the car to Kaenel. Thus, the antagonism of defenses that Korabik and Kaenel claim required severance amounted to little more than mere speculative assertions that each was innocent because the other must have killed Werner.

We have held that such finger-pointing does not justify separate trials, and "is an acceptable cost of the joint trial and at times is even beneficial because it helps complete the picture before the trier of fact." *Buljubasic,* 808 F.2d at 1263. In the present case, we hold that the defenses—whose antagonism is neither well-supported by the evidence nor fully relevant to the charges in the indictment—do not evince the kind of drastic conflict that ordinarily justifies an interference with the district court's exercise of its sound discretion. *See Bruun,* 809 F.2d at 407. Thus, we refuse to overrule the district court's denial of the defendants' motion for separate trials.

■■ Korabik also argues that the district court erred in allowing the introduction of evidence that Kaenel sold guns to an undercover agent of the Bureau of Alcohol, Tobacco and Firearms ("ATF") during July and September, 1984 (more than two years after Werner's murder). Kaenel also challenges the admission of this evidence. The government introduced the evidence, in the form of ATF Agent John Mazzola's testimony and two taped-recorded conversations, to establish the existence of a relationship between Korabik and Kaenel that included the exchange of firearms. The district court considered the issue on pretrial pleadings and ruled the evidence admissible. Like the other evidentiary rulings we have reviewed in this opinion, we will reverse this decision only upon a showing that the district court abused its discretion. *See Mealy,* 851 F.2d at 898 (citing cases).

The evidence at issue arose from an undercover firearms investigation unrelated to Werner's murder. As part of that investigation, Mazzola met Kaenel twice in 1984. Both meetings were recorded. During the

first meeting, Kaenel discussed gun prices and then sold Mazzola two handguns and a sawed-off shotgun. Kaenel also said that he previously had "shot up" his basement with a "Mini-mac" machine gun. During their second meeting, in September, Kaenel provided information about the source of the guns he sold. Though he mentioned no names, Kaenel stated that his source worked at the Gun World store, that he provided Kaenel with ammunition as well as guns, that the source had numerous guns kept in a locker at home, and that the source could convert a gun to fully automatic. Kaenel also said that the source recently had problems with a woman. The government introduced related evidence to demonstrate that Kaenel was describing Korabik when he discussed his source with Agent Mazzola. For instance, the government presented various evidence to show that Korabik worked at a store called Gun World, was an expert on firearms, and owned a number of guns. Moreover, Debra broke off her relationship with Korabik around the time that Kaenel sold guns to Agent Mazzola. *See* Trial Trans. at 1576–77.

Rule 404(b) forbids the admission of evidence of other crimes, wrongs, or acts to demonstrate criminal propensity, but permits admission of such evidence for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b). In *United States v. Shackleford*, 738 F.2d 776 (7th Cir.1984), we outlined a four-part standard for the admission of evidence under Rule 404(b):

[A]dmission of evidence of prior or subsequent acts will be approved if (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close

enough in time to be relevant to the matter in issue ... (3) the evidence is clear and convincing,[4] and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*Id.* at 779.

As to both Korabik and Kaenel, the evidence garnered from Kaenel's transactions with Agent Mazzola satisfy these requirements. As we have stated, the government presented the evidence not to show propensity, but instead to suggest that a relationship existed between Korabik and Kaenel in which guns were exchanged. Although the transactions with Agent Mazzola took place two years after Werner's murder, they occurred during the life of the conspiracy proved at trial, which was alleged to have continued through 1984. Finally, in light of the extensive evidence admitted at trial which suggested that Korabik and Kaenel were friends and that both owned several guns, the possibility of unfair prejudice from the admission of the Rule 404(b) evidence was minimal. *See, e.g.,* Trial Trans. at 1387–88. For these reasons, we hold that the district court did not abuse its discretion in admitting Agent Mazzola's testimony and the related tape recordings.

■ Korabik also argues that his Due Process rights were violated when James Pappas, his alibi witness, invoked the Fifth Amendment in response to the government's questions during cross-examination. The questions involved an illegal sale of firearms by Pappas to an undercover state police officer. The government's questions were plainly admissible under Fed.R.Evid. 608(b) which permits the introduction of specific instances of conduct by the witness for the purpose of attacking that witness's credibility.

---

4. As we have noted in previous opinions, the Supreme Court lowered *Shackleford's* standard of "clear and convincing" proof that the defendant committed the similar act. In *Huddleston v. United States*, 485 U.S. 681, 689, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988), the Supreme Court held that similar act evidence should be admitted if there is "sufficient evidence" to support a finding by the jury that the defendant committed the similar act. *See United States v. Elizondo*, 920 F.2d 1308, 1320 n. 10 (7th Cir. 1990); *United States v. Khorrami*, 895 F.2d 1186, 1194 n. 3 (7th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 522, 112 L.Ed.2d 533 (1990).

Prior to Pappas's testimony, the government tendered material relating to the sale of arms *in camera* to the district court.[5] *See* Trial Trans. at 2407–08. The material described a 1987 sale by Pappas of three handguns to an undercover police officer at O'Hare Airport for $750. During the sale, the officer posed as a gang member who did not possess the required Illinois Firearm Owner's Identification ("FOID") card. The material also indicated that Pappas conducted the transactions without completing the necessary forms and even offered to "create" paperwork naming a fictitious person as purchaser. *See* Trial Trans. at 2423, 2435–36. Pappas consulted an attorney and decided that he would invoke his Fifth Amendment right to decline to incriminate himself in response to any questions concerning the sale. After reviewing the government's material and listening to Pappas's intended response, the district court ruled that the government's line of questioning regarding the illegal sale was appropriate for cross-examination under Rule 608(b). *See* Trial Trans. at 2433.

 Korabik claimed in a post-trial motion—and renews that claim before us—that the government relied on false information. Korabik argues that because the buyer in fact possessed a FOID card (the buyer was in fact a police officer), the government asked the question deliberately to force Pappas to invoke the Fifth Amendment in front of the jury, and thereby violated the defendant's right to a fair trial. We are not persuaded. Because the illegal sale involved dishonesty, it was relevant to Pappas's credibility and, thus, properly raised under Rule 608(b). In addition, Pappas claimed on direct examination that when he bought guns from Korabik, he filled out records of these purchases. *See* Trial Trans. at 2389–93. On cross-examination, Pappas stated that he knew the requirements for recording gun sales and always filled out the proper forms. *See* Trial Trans. at 2407. Thus, any reliable

evidence that suggests the Pappas was not as careful as he claimed to be would cast doubt on his credibility as a witness. If Korabik's alibi was devastated as a result of Pappas's invocation of the Fifth Amendment in response to the government's cross-examination, it was only because Pappas properly was impeached. Neither the district court nor the government committed error. *See United States v. Kaplan,* 832 F.2d 676, 684 (1st Cir.1987) (invocation of the Fifth Amendment during cross-examination is proper under Rule 608(b) and may be considered by the jury as a form of impeachment) (citing *Caminetti v. United States,* 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917)), *cert. denied,* 485 U.S. 907, 108 S.Ct. 1080, 99 L.Ed.2d 239 (1988).

Korabik's remaining claims merit far less attention. Korabik argues that the district court erred in several ways: (1) by refusing to grant his motion for a mistrial due to the government's alleged *Brady* violations; (2) by admitting the testimony of one Alden Steiffel as an admission by silence; (3) by granting the government's motion to preclude reference to the fact that no murder indictment had been returned by the state against the defendants; (4) by denying another motion for mistrial due to the government's allegedly improper comment during rebuttal concerning *Kaenel's* motive in turning over evidence to the police; and (5) by admitting into evidence a certified statement of the United States Naval Observatory which listed the recorded times for civil twilight in Chicago on the night of Werner's murder (the civil twilight letter). Finally, Korabik rounds out his claims of error with the contention that the evidence was insufficient to support his conviction.

 None of these claims persuade us; Korabik's arguments simply fail in light of well-settled law and the ample evidence against him. For instance, Korabik's claim that the government violated the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct.

---

5. Korabik argues that the government committed "wrongful conduct" by refusing to allow defense counsel access to the material that described the illegal sale. *See* Korabik's Brief at

31–32. Korabik apparently forgets that defendants are not entitled access to Rule 608(b) materials which are not discoverable under Fed. R.Crim.P. 16.

1194, 10 L.Ed.2d 215 (1963), overstates, among other things, the significance of the material at issue.[6] To make a successful claim under *Brady*, the defendant must establish (1) that the prosecutor suppressed evidence; (2) that such evidence was favorable to the defense; and (3) that the suppressed evidence was material. *United States v. Jackson*, 780 F.2d 1305, 1308 (7th Cir.1986). Evidence is material only if there is reasonable probability that the result of the trial would have been different if the evidence had been disclosed. *United States v. Driver*, 798 F.2d 248, 250 (7th Cir.1986) (quotations omitted). In *United States v. McAnderson*, 914 F.2d 934, 947 (7th Cir.1990), we stated that the district court maintains the broad discretion to determine what evidence is material for purposes of *Brady*.

■ In the present case, Korabik claims that the government violated *Brady* by disclosing during trial material that allegedly supported his theory that Werner was murdered because he defaulted on his "juice loans" to the "mob." The evidence at issue involved the transcript of a government witness's grand jury testimony, which the prosecutors gave to the defense a day before the witness testified. Apparently the witness had testified that she heard rumors from her ex-husband Wayne Phillips that Werner owed money to the owners of the Smoker's Club. When Korabik's counsel brought the allegedly late disclosure of Wayne Phillips to the district court's attention, the district court offered to try to locate Phillips. When efforts to find Phillips failed, the district court declined to delay the trial and held that the Phillips information was "pretty tenuous" as *Brady* material. *See* Trial Trans. at 2327. We find no error in that determination. Nor do we detect error in the district court's other rulings on which Korabik bases his remaining claims. Suffice it to say that the chal-

lenged items properly were admitted; that Korabik was not entitled to tell the jury that the state had not returned a murder indictment against the defendants; and that the district court's denial of the defendant's motion for mistrial was well within its broad discretion. Put simply, the record is replete with evidence supporting Korabik's conviction, and the district court committed no abuse of discretion in the long and complicated trial.

## C. Kenneth Kaenel

Kaenel raises five claims of error—three of which we already have resolved.[7] In his two remaining claims, Kaenel argues that he was denied Due Process when the district court refused to hold an evidentiary hearing on the issue of the government's use of his statements, and that the imposition of consecutive sentences violated the double jeopardy provisions of the Fifth Amendment. We will consider each argument in turn.

■ On May 9, 1986, Kaenel and his attorney met with state and federal prosecutors to discuss Kaenel's participation in the government's continuing investigation of Werner Hartmann's murder. According to the affidavit of Kaenel's attorney, the state and federal prosecutors told Kaenel that "nothing he said would be used against him" and that the judge in Kaenel's federal case would be advised of the extent of his help if he cooperated in the government's investigation. Specifically, Kaenel was told that he had to give a truthful statement and later testify, and that he might also have to place recorded calls or "wear a wire" to help gather evidence. Kaenel insists that this arrangement constituted an unconditional promise of immunity. The government maintains that the arrangement was not a grant of formal immunity, but instead was a deal in which

---

**6.** *Brady* holds that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–1197.

**7.** Kaenel's three claims challenging the admission of evidence regarding his sale of guns to an ATF agent, the admission of Werner's statements, and the district court's refusal to grant separate trials already have been resolved. *See supra* at 782–785, 786–787, 787–788.

each side had to perform—Kaenel was to give information and help gather evidence, and the government then would not use the information against him.

After Kaenel ceased cooperating and the case against him came to trial, the district court concluded that an evidentiary hearing on whether the government's proposed use of the information provided by Kaenel violated any promise of immunity was not necessary. The district court agreed with the government: the alleged promise of immunity was at most an agreement not to use information against him in exchange for his cooperation. When Kaenel stopped cooperating before that investigation was complete, he unilaterally breached that agreement and thereby freed the government from its obligations under the agreement. *See United States v. Brown*, 801 F.2d 352, 355 (8th Cir.1986) ("Generally speaking, a cooperation-immunity agreement is contractual in nature and subject to contract law standards.... The language of the contract is to be read as a whole and given a reasonable interpretation, not an interpretation that would produce absurd results.") (quoting *United States v. Irvine*, 756 F.2d 708, 710 (9th Cir.1985) (per curiam)).

The district court also observed that the government had established, for all but two items, that it inevitably would have discovered the evidence Kaenel initially provided. Those two items—shell casings from Kaenel's basement that matched those found in Werner's home and keys to a Mercedes that belonged to Debra—were merely cumulative pieces of evidence, the impact of which (i.e. connecting Kaenel to the murder weapon and to Debra) was amply supported by other sources. Thus, the district court observed that

> [e]ssentially it is [Kaenel's] position that he could enter into an agreement which required his continued cooperation, could provide evidence to the government, could then cease cooperation, could exclude the evidence previously provided, and could then also require the government to establish that the evidence it wished to introduce came from independent sources. We disagree. The result

of Kaenel's decision not to continue to live up to his part of the bargain was to excuse the government from adhering to whatever promises it had made, not to create a tactical advantage to [Kaenel].

Memorandum and Order, February 28, 1990, Kaenel's Additional Appendix at 95–96.

We see no error in the district court's refusal to hold an evidentiary hearing. In *United States v. Hamm*, 786 F.2d 804, 807 (7th Cir.1986), we declared that without the presentation of facts that would justify relief, no hearing is necessary. In the present case, the district court held that Kaenel failed to present such facts. Indeed, Kaenel does not dispute that he stopped cooperating prior to the close of the investigation. Instead, he seeks to justify his unilateral breach of the agreement by suggesting that any continued cooperation on his part would have jeopardized his life. He seeks to support this argument by appealing to the law on self-defense. *See* Kaenel's Brief at 17–19.

Kaenel's argument raises a novel question: whether a defendant who makes an agreement to cooperate in a government investigation may cease cooperating and still enjoy the benefits of the agreement when any further cooperation would place that defendant's life in danger. This appeal marks the first time that Kaenel has raised this argument. Kaenel points to statements offered in his affidavit that support his claim that further cooperation with the government might "get [him] and his family killed" or might "get his * * * damn head blown off." Even though Kaenel's affidavit contains these statements, Kaenel's counsel neglected to argue before the district court that the principles of self-defense relieved the defendant of any obligation to continue cooperating with the government.

Instead, the defendant chose to argue that the government's offer of immunity was not conditional; that is, Kaenel claimed only that he was under no obligation to continue cooperating with the government in order to receive immunity.

*See* Kaenel's Memorandum in Support of Motion for New Trial, Kaenel's Additional Appendix at 78. Thus, the record lacks any arguments or facts supporting Kaenel's new claim. Without a proper record, we are unable to evaluate the defendant's argument. As we have declared many times, arguments not made in the district court are waived on appeal absent a showing of plain error. *United States v. Henry,* 933 F.2d 553, 558 (7th Cir.1991). *See also* Fed.R.Crim.P. 52(b); *United States v. Smith,* 869 F.2d 348, 356 (7th Cir.1989).

In the instant case, then, we hold that the district court did not commit plain error in denying Kaenel's request for an evidentiary hearing. Kaenel voluntarily agreed to cooperate in an investigation that sought to uncover the conspiracy that caused the murder of Werner Hartmann. Kaenel then chose not to cooperate after he already provided some help. Kaenel's decision to cease cooperating removed any obligation on the government to perform its promises under the now defunct agreement. Put simply, by changing his mind about cooperating, Kaenel gave up any protection he had bargained for and subjected himself to prosecution. *See United States v. Calabrese,* 645 F.2d 1379, 1390 (10th Cir.) ("It is clear that a defendant's failure to fulfill the terms of a pretrial agreement relieves the government of its reciprocal obligations under the agreement."), *cert. denied,* 451 U.S. 1018, 101 S.Ct. 3008, 69 L.Ed.2d 390 (1981).

We note that Kaenel's claim that the principles of self-defense excused his decision to cease cooperating would fail even if it had been raised before this appeal. The decision of a defendant to "flip" (i.e. cooperate with the government's investigation) is most always fraught with danger. The defendant-turned-informant takes on the risks that law enforcement personnel face throughout a dangerous investigation. To permit a defendant to cease cooperating at any time and still receive the benefits of his previous agreement with the government simply would allow the defendant to select without risk what information he wished the government to obtain. We will not permit this potential for deliberate manipulation by the defendant. Instead, we af-

firm the district court's ruling that requires a defendant to honor the cooperation agreement in order to enjoy the benefits that the government has promised.

■ Even if we held that government violated some agreement to Kaenel, the evidence he sought to suppress still would have been properly admitted. The government demonstrated that the evidence Kaenel initially provided inevitably would have been discovered through sources independent of his cooperation. The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation. *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2503, 81 L.Ed.2d 377 (1984) ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... the evidence should be received."). As the district court properly found, the two items that Kaenel solely may have provided—the shell casings and the car keys—were not so critical to the case that their admission requires reversal. Thus, the Kaenel's claims regarding the information he provided to the government are without merit.

■ Finally, Kaenel argues that the consecutive nature of his sentences violates constitutional prohibitions against double jeopardy and cruel and unusual punishment. Kaenel was convicted on the thirty counts of mail and wire fraud. He received five-year concurrent terms on four separate groups of counts. The four five-year terms were to be served consecutively for a total of twenty years imprisonment. Although acknowledging that consecutive sentences are permissible under *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), Kaenel cites various commentators to suggest that such terms should not be imposed in this case. *See* Kaenel's Brief at 32–34. Kaenel overlooks the wealth of authority that has held that each mailing in a mail fraud conspiracy constitutes a separate offense. *See United States v. Allen,* 797 F.2d 1395, 1402 (7th Cir.) (each mailing or use of wire com-

munications under 18 U.S.C. §§ 1341 and 1343 constitute separate offenses), *cert. denied*, 479 U.S. 856, 107 S.Ct. 196, 93 L.Ed.2d 128 (1986). The fact that this holding has been criticized by various commentators does not persuade us to vacate Kaenel's sentence. On the contrary, we see no error in the district court's determination.

### III.

For the foregoing reasons, we AFFIRM the convictions and sentences of Debra Hartmann, John Scott Korabik, and Kenneth Kaenel as entered by the district court.